APEX COLORS, INC., )
    Plaintiff, )
  )
v. ) CAUSE NO.: 2:14-CV-273-PRC
  )
CHEMWORLD INTERNATIONAL LIMITED, )
INC., CHEMWORLD INTERNATIONAL )
LIMITED, LLC, ATUL MODI, and MANOJ )
MODI, )
    Defendants. )
_____ )
  )
APEX COLORS, INC., )
    Plaintiff, )
  )
v. )
  )
PAUL BYKOWSKI, )
    Defendant. )

## OPINION AND ORDER

This matter is before the Court on Apex Colors, Inc.'s Amended Motion for Preliminary Injunction [DE 197], filed by Plaintiff Apex Colors, Inc. ("Apex") on March 6, 2015. Apex seeks a preliminary injunction on its claims of misappropriation of trade secrets, unfair competition, and trademark infringement of its registered trademark MegaSpecks. The Court held an evidentiary hearing on April 16, 17, and 20, 2015. This Opinion and Order constitutes the Court's findings of fact and conclusions of law.

## PROCEDURAL BACKGROUND

On July 22, 2013, Plaintiff Apex filed a lawsuit against Paul Bykowski in cause number 2:13cv247, alleging misappropriation and conversion of Apex's confidential and valuable information, assets, and trade secrets and tortious interference with Apex's prospective economic advantage. On March 14, 2014, Bykowski filed for bankruptcy protection in Northern District of

Indiana Bankruptcy Case No. 1:14-20714. Seeking to avoid the bankruptcy discharge, on June 6, 2014, Apex filed an Adversary Complaint mirroring the original Bykowski litigation.

On August 5, 2014, Apex filed a Complaint based on the same operative facts against Chemworld International Limited, Inc., Chemworld International Limited, LLC, Atul Modi, and Manoj Modi (collectively the "Chemworld Defendants") in this case, cause number 2:14cv273, alleging claims of civil conspiracy to misappropriate Apex's property (Count I), civil conspiracy to tortiously interfere with Apex's prospective economic advantage (Count II), and misappropriation of trade secrets in violation of the Indiana Trade Secrets Act (Count III). Atul Modi is vice president and a fifty-percent shareholder of Chemworld International Limited, Inc, and Manoj Modi is president and a fifty-percent shareholder of Chemworld International Limited, Inc.

On October 8, 2014, Apex filed a Motion for Preliminary Injunction. Shortly thereafter, the Court held a preliminary pretrial conference and, with the parties' agreement, set a deadline of January 15, 2015, for the parties to conduct discovery for the purposes of the motion for preliminary injunction and alternative dispute resolution. The parties consented to magistrate judge jurisdiction.

On October 21, 2014, Apex filed a Motion to Withdraw the Reference of the Bykowski Adversary Complaint. On November 21, 2014, the Honorable Kent Lindquist filed a recommendation that the reference for the Bykowski Adversary Complaint be withdrawn. The Adversary Complaint was then transferred to the District Court on December 12, 2014, in a newly opened cause number 2:14cv456, and the parties subsequently consented to magistrate judge jurisdiction in that case. On December 18, 2014, the Court consolidated cause number 2:14cv456 into cause number 2:14cv273 for all purposes.

After learning that the parties were no longer interested in attempting mediation and at the request of Defendants, the Court set the Motion for Preliminary Injunction for hearing for March 24, 2015, which was later reset for April 16, 2015.

On March 3, 2015, Apex sought leave of Court to file an Amended Complaint. The Court granted the motion, and Apex filed the Amended Complaint on April 8, 2015, adding Bykowski as a named defendant to Counts I-III and adding claims against all Defendants of unfair competition under Indiana law (Count IV) and federal trademark infringement based on Apex's MegaSpecks trademark (Count V).

On March 6, 2015, Apex filed an Amended Motion for Preliminary Injunction. Therein, based on its claims of misappropriation, unfair competition, and trademark infringement, Apex asks the Court to enjoin the Chemworld Defendants and Bykowski from using Apex's trade secrets, confidential information, and trademark MegaSpecks in Chemworld's and Bykowski's business. On April 16, 17, and 20, 2015, the Court held an evidentiary hearing on the motion. The parties filed proposed findings of fact and conclusions of law on June 1, 2015.

The parties have agreed to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## FINDINGS OF FACT

Shyam Zalani is the sole shareholder and director of Apex Colors, Inc. (Tr. Vol. 1, at 13, 32).

Zalani started a specialty chemical business, Indace, Inc. ("Indace"), in 1993. *Id*. at 14. Indace targeted the import and sale of a variety of chemicals, including dyes and pigments, which are additives used to introduce color to products in the plastics and coatings industries. *Id*. at 13, 14. The specialty chemicals are in powdered form. *Id*. at 13. Indace, through Zalani, invested years, as well as substantial financial resources, to qualify Indace's supply chain, visiting more than 100 potential overseas manufacturers. *Id*. at 16, 28-29. After the initial qualification by Zalani, Indace identified attributes to establish Indace's special requirements for the manufacturers' products in order to guarantee quality. *Id*. at 16, 18, 19. The quality was controlled by chemical test methods

established by Indace, and the product was tested once at the manufacturing level and then by an independent laboratory in India or China. *Id*. at 19.

Product "standards," which Zalani defined as a "color match," are in the form of powder and are produced by the original manufacturer of the colorants. *Id*. at 24, 27. The standards "represent[] a match to color for reference." *Id*. at 24. Product "specifications" are all the attributes, including the color match and impurities, that determine the quality of the product. *Id*. at 25. Zalani testified that, for each product attribute, Indace created tolerances that were unique to Indace through Zalani's knowledge of and experience in manufacturing the product. *Id*. at 25-26.

Indace products were imported into the United States and sold to a variety of customers over a period of eight years as Indace's business developed. *Id*. at 17, 103. These customers included manufacturers, independent distributors, and end use customers. *Id*. at 17, 111, 146. Initially, Indace outsourced its laboratory testing in the United States. *Id*. at 31, 32. Zalani testified that confidentiality agreements were in place with contract laboratories regarding the information that Indace provided them. *Id*.

In 1998, Indace decided to expand and segment its business into three independent sectors: establishment of a supply chain through Indace, an independent testing and certification laboratory, and a distribution and marketing company. *Id*. at 26, 31. In 2001, Indace moved the laboratory testing "in-house" with the creation of Apex Colors, Inc. as the second segment of the business model. *Id*. at 27, 32, 131. Zalani testified that Indace transferred its ownership of powder standards, test methods, and product specifications to Apex. *Id*. at 27, 31-33, 103. Apex leased space for the laboratory in Portage, Indiana, purchased laboratory equipment, and modified the leased space at an initial cost of approximately $150,000. *Id*. at 34. Apex also established an inventory of products for sale. *Id*. at 35.

Zalani met Paul Bykowski in 1996/1997, at which time Bykowski was employed by one of Indace's customers, PolySolve. *Id.* at 42. Craig Weadon was the owner of PolySolve and employed Bykowski as PolySolve's lab manager. (Tr. Vol. 3, at 524, 529). When PolySolve later faced financial trouble, Bykowski approached Zalani for a job. (Tr. Vol. 1, at 42).

In August 2001, Bykowski resigned from PolySolve; when he left, he took jars of powder standards from PolySolve without authorization from Weadon. (Tr. Vol. 3, at 534, 536). Valerie Deehan, a lab technician at PolySolve, helped Bykowski pack the powder standards when he left. *Id.* at 477. Bykowski testified that all the standards he ever used at Apex, and later at Finos, were the standards he took from PolySolve. (Tr. Vol. 2, 262). Deehan later went to work as a lab technician for Bykowski at Apex in 2003. (Tr. Vol. 3, at 480). Deehan testified that she did not know the source of all the powder standards at Apex in 2003; however, she testified that the jars of standards in Apex's warehouse looked like the same standards she had packed for Bykowski when he left PolySolve and that some of them were in the same jars. *Id.* at 481, 488. When Deehan left her employment with Apex, to her knowledge, the jars of standards in the warehouse were the same standards she had helped Bykowski pack at PolySolve. *Id.* at 485.

Bykowski was Apex's president from 2001 through September of 2012, and he was employed as the lab manager. (Tr. Vol. 1, at 42-43, 163-64); (Ex. 118). Bykowski's duties for Apex included obtaining a lease for Apex's lab, hiring employees, setting up the lab, and performing all testing and product certification. (Tr. Vol. 1, at 43, 243; Vol. 3, at 487). Bykowski signed an employment agreement with Apex ("2001 Employment Agreement"); the 2001 Employment Agreement is not dated and is not signed by Zalani or anyone on behalf of Apex. (Ex. 11). The 2001 Employment Agreement includes a section titled "Nondisclosure and Noncompetition" with a subsection titled "Confidential Information." (Ex. 11, § 1.2, 1.2.a). That subsection defines "Confidential Information" to mean:

any trade secrets or information known to Employee as a result of his employment with Employer, at any time before or from and after the date of this Agreement (*not including information originated by Employee*) of a secret, proprietary or confidential nature relating to Employer, products, business policies and operations, including, without limitation, all *methods*, formula, forecasts, *customer requirements*, *processes*, products, marketing strategies, *data*, improvements, *product development*, financing, strategies, price lists, commission schedules, forecasts, *prospective customer lists*, marketing programs and accounting systems, unless such information is in the public domain to such an extent as to be readily available to competitors.

*Id*. at § 1.2.a (emphasis added). The subsection further provides that "Confidential Information *shall include* the work product of Employee developed as a part or in furtherance of, or during the working hours of, Employee's employment with Employer and *shall not include* all customers and prospective customers developed or identified by Employee." *Id*. (emphasis added).

As relevant to this litigation, the provision further provides:

All Confidential Information provided to Employee, or to which Employee, intentionally or inadvertently, otherwise becomes aware, knowledgeable, or in possession of as a direct or indirect result of Employee's employment with Employer, *except that information which the Employee brings with him*, shall be held and protected by Employee with the strictest confidentiality, and Employee shall take all reasonable steps to protect the confidentiality of the Confidential Information provided to Employee, and, except as required by law, court order or any governmental authority, Employee shall not, whether during or after employment cause or allow any of the Confidential Information to be disclosed, delivered, transferred, or otherwise made known to any person or entity not expressly authorized by Employer to receive or be made aware of the same.

*Id.* (emphasis added).

The Limitation on Use subsection provides that all "Confidential Information" Bykowski receives or becomes knowledgeable about

shall be utilized by Employee for the singular purpose of carrying out Employee's duties and undertakings on behalf of Employer. Employee shall diligently protect and maintain the confidentiality of the Confidential Information. In no event shall Employee, whether during or after employment, *copy any Confidential Information*, except as needed, *nor utilize any Confidential Information in a manner so as to compete with Employer*, or *to aid or further the competition of any other person or*

> *entity with Employer*, or to otherwise disclose or dispose thereof for personal gain or for any reason injurious to the interest of Employer during the term hereof.

*Id*. at § 1.2.b (emphasis added). Zalani testified that this final provision was important to prevent Apex's investment and business interest being used by Bykowski for any other purpose. (Tr. Vol. 1, at 45-46). Zalani testified that Bykowski was not authorized to disclose Apex's confidential information, product specifications, test data, or supplier information with Apex's customers or competitors and that Zalani, as the shareholder and director of Apex, expected that Bykowski, as Apex's president, would further Apex's business and not his own interests. *Id*. at 49-50.

Apex maintained the confidentiality of product specifications by limiting access to its lab and requiring employees to agree to maintain the confidentiality of company information. *Id*. at 36. Apex also developed a domestic supply chain for products, which it kept confidential to avoid its customers from circumventing Apex and going directly to Apex's suppliers. *Id*. at 37-38. Zalani testified that Apex continued to develop and refine its test methods and product specifications to accommodate market demand as well as manufacturing changes. *Id*. at 27-28, 38-39. Zalani testified generally that Apex undertook efforts to keep the test methods confidential. *Id*. at 39. Apex also obtained qualifications with customers through a customer approval process that took up to several months. *Id*. at 39-40. Once Apex achieved qualification with a customer, each purchase by that customer from Apex included a "product certification" identifying information pertaining to the color of the product supplied; however, the product certification did not include other tolerances or attributes. *Id*. at 40, 137-38. Each product certification contained a unique number for a particular product known as a standard lot number. *Id*. at 40-41. Bykowski developed a standard lot number system for Apex that allowed Apex to trace a product back to the ultimate supplier in the event of any problems; competitors did not use Apex's standard lot numbers. *Id*. at 41, 180-81, 183; (Tr. Vol. 3, at 492-493); (Ex 19). Standard lot numbers were publicly known information. *Id*.

In February 2002, Apex along with Eric and James Boggess created Finos, LLC as the third segment of Indace's new business model to be the marketing and distributing company for Indace's products that were being tested and certified through Apex. (Tr. Vol. 1, at 31, 50); (Ex. 85). Apex's capital contribution to Finos did not include any of Apex proprietary or confidential information, including Apex's product specifications, testing methods, or lab equipment. (Tr. Vol. 1, at 53-54); (Ex. 85). Additionally, Zalani had no intention that Apex would disclose Apex's proprietary information, including product specifications, testing, and results, to the other members of Finos. (Tr. Vol. 1, at 60). Under Finos' Operating Agreement, Apex was to be the source of the majority of Finos' products and to supply laboratory services for testing the quality of materials. *Id*. at 54-55; (Ex. 85). Bykowski did not sign an employment confidentiality noncompete agreement with Finos. (Tr. Vol. 2, at 327). Finos paid the salary of Apex's employees, including Bykowski and Deehan, and Finos paid the rent for the laboratory in Portage, Indiana. (Tr. Vol. 1, at 125-26).

When Doug Thompson, an employee of W.B. Tabler, a separate company owned by the Boggesses, visited the Portage, Indiana, laboratory in 2002, Bykowski required Thompson to sign a nondisclosure confidentiality agreement. (Tr. Vol. 1, at 134); (Tr. Vol. 2, at 408-09, 413). Bykowski required Deehan to sign a confidentiality agreement when she began working for Apex. (Tr. Vol. 3, at 480, 487). Deehan understood that, while at Apex and later when she was paid by Finos, Bykowski did not want her sharing with any of Apex's competitors any confidential information, including product standards, product specifications, or testing procedures. *Id*. at 487-88, 494. Deehan understood that the powder standards were not allowed to be taken out of the lab, the facility was locked and had an alarm system, and the computers were password protected. *Id*. at 494-95. Limited access was granted to the laboratory in Portage, Indiana, and all records were kept inside the lab. (Tr. Vol. 1, at 36). Zalani testified that employees were required to agree to the

confidentiality of company information. *Id*. Zalani testified that Apex kept its domestic supply chain confidential. *Id*. at 37.

Bykowski testified that he did not develop any products, product specifications, or test methods and procedures while at Apex; rather, he testified that he brought all the product specifications and test methods and procedures from PolySolve and used them at Apex. (Tr. Vol. 1, at 164). However, some of the product specifications were "tweaked" while at Apex. *Id*. at 165. He testified, "I might have moved a decimal or, you know, set a minor shift. But all the specifications were based on the ones from PolySolve." *Id*. Zalani testified that Indace transferred ownership of its product specifications to Apex. *Id*. at 33.

Bykowski testified that, while working at Apex, he had direct knowledge of Apex's product specifications, ongoing product development at Apex, the standards used at Apex and later Finos, test methods, test data, lab equipment, some pricing, and Apex's customers. *Id*. at 165-67. Bykowski maintained electronic business records on a personal laptop computer, which he took with him when he left Apex and which he testified that he lost a few months before the hearing. *Id*. at 169-70. While Bykowski worked for Apex, and later Finos, he used personal email accounts at either frontier.com or hotmail.com without objection from Zalani at Apex or the Boggesses at Finos; he did not have a dedicated Apex or Finos email account. (Tr. Vol. 2, at 321-22).

Although Apex performed testing and certification services, Finos' name was on product certifications because the product was being sold by Finos. (Tr. Vol. 1, at 58-59). Separate from the final "product certifications," there were "data sheets" or "worksheets" that were created while the testing was done in the lab. (Tr. Vol. 3, at 497). Those data sheets initially had the Apex Colors name at the top until either the establishment of Finos or when the lab was ISO certified under Finos, at which point the sheets had the Finos name at the top. (Tr. Vol. 3, at 500). There were also "batch

data sheets" produced in the Portage, Indiana, laboratory; these batch data sheets are not identified as either Apex or Finos. *See, e.g.*, (Ex. 35) (8/31/2011); (Ex. 40) (8/7/2003); (Ex. 41) (10/23/2006).

Doug Thompson testified that, while he was working for W.B. Tabler at the Portage, Indiana, laboratory and sharing Apex's laboratory space, he developed standards for products that he took to W.B. Tabler. (Tr. Vol. 2, at 443). Those standards had a Finos label and were incorporated into the Finos business. *Id*. Thompson testified that some of the powder standards at the laboratory had Finos labels and some had Apex labels. *Id*.

PolySolve was not an ISO-certified laboratory, a certification desired by customers. (Vol. 3, at 489, 494). The laboratory in Portage, Indiana, became ISO certified in Finos' name under Bykowski's direction in 2003 or 2004. *Id*. at 486, 490-492, 494, 500; (Tr. Vol. 1, at 35, 91).

Chemworld was one of Finos' suppliers, selling solvent dyes to Finos. (Tr. Vol. 2, 363).

Finos developed a product called "MegaSparkles" by buying a glitter effect product from another company and selling it as MegaSparkles. (Tr. Vol. 1, at 151-152). Eric Boggess knew the source of the glitter effect product that was marketed by Finos as MegaSparkles. *Id*. at 152. The trade name MegaSparkles was developed by Finos. (Tr. Vol. 2, at 259). After Bykowski left Apex in 2012 and was selling products for Chemworld as an independent sales representative, Bykowski sold Chemworld customers a product named "MiraSparkles," which Bykowski represented was the same product previously sold as MegaSparkles. *Id*. at 259-60. Bykowski testified that the formulation of MiraSparkles was the same as MegaSparkles, as both were the same "bought-off-the-shelf" product renamed as MegaSparkles or MiraSparkles. *Id*. at 258-59. Bykowski told customers that MiraSparkles had the same source and was the same material that they had previously purchased from Finos as MegaSparkles. (Tr. Vol. 1, at 224).

Finos also developed a product called "MegaSpecks," which created a granite effect and which was different from PolySolve's sparkle-effect product. (Tr. Vol. 3, at 495-497). Bykowski

denies knowing the composition for MegaSpecks. (Tr. Vol. 2, at 225). He testified that he has never known the composition because W.B. Tabler guarded it closely to keep it from Zalani. *Id.* Bykowski testified that he does not currently sell a product for Chemworld that has the same composition as MegaSpecks. *Id.* at 224.

There was no secrecy agreement between Indace or Apex and any of their product suppliers. (Tr. Vol. 1, at 152). There was no secrecy agreement between Apex and its customers. (Tr. Vol. 1, at 153).

Bykowski was not authorized by Zalani or Apex to sell products on behalf of Finos' competitors, use Apex's lab for the benefit of any entity other than Apex in the course of Finos' business, disclose customer information of Finos such as purchase history or pricing, or provide Finos' customers with supplier information. *Id.* at 61-62.

While Bykowski was working for Apex and without written authorization, Bykowski sold product to Finos' customers on behalf of Chemworld when Finos refused to sell to them. *Id.* at 172, 209-10. Bykowski received a commission from Chemworld, the supplier. *Id.*; (Tr. Vol. 2, at 252-53). For these sales, Bykowski certified the product at the Portage, Indiana, laboratory with Apex equipment using the same product specifications and test methods used in Apex's business. (Tr. Vol. 1, at 173). Bykowski issued product certifications in the name of Chemworld in the same format as Finos product certifications and used the same computer most of the time to generate the product certifications. *Id.* at 173-74; *compare* (Exs. 78, 80) (Finos product certifications), *with* (Exs. 63, 68, 70, 106,107) (Chemworld product certifications). The phone number on some of the Chemworld product certifications was Apex's. (Tr. Vol. 1, at 197); (Exs. 78, 106). Bykowski also used Apex's six-digit standard lot number for Chemworld product certifications during that time. *Id.*

Bykowski did not have authorization from Apex or Finos to use the Portage, Indiana, laboratory to perform certifications for competitors. *Id.* at 193. The one product certification offered

in evidence by Apex to show that Bykowski was certifying product for Chemworld while still employed by Apex was a certificate for a pigment; Bykowski testified that Apex and Finos refused to sell pigments. *Id*. at 196; (Exs. 106, 107) (Chemworld product certification dated Nov. 10, 2011 for Pigment Yellow 6211).

Prior to its relationship with Bykowski, Chemworld did not have any sales representatives for solvent dyes and pigments. (Tr. Vol. 2, at 398). Chemworld did not have and still does not have its own laboratory or do its own testing or certification; however, after Bykowski left Apex, Bykowski set up a new laboratory in Portage, Indiana, in January or February 2013, and Chemworld pays two-thirds of the laboratory rent. *Id*. at 398-99, 400.

Finos' entity dissolution proceedings commenced in 2011, but Finos continued to operate and provide testing and certification through the Portage, Indiana, laboratory. (Tr. Vol. 1, at 62-63). The complaint for dissolution of Finos, filed by Zalani, indicates that Apex transferred all of its existing business, customers, product, and product ideas to Finos. (Tr. Vol. 3, at 506, 515); (Ex. F, ¶ 8).

Pursuant to a Settlement Agreement related to the dissolution of Finos, which was final in early 2013, Apex received the exclusive right to use the product name and the formulation for the product known as MegaSpecks. (Ex. 13, § 2(a)). The Boggesses retained the exclusive right to use the product name MegaSparkles and to sell products under that trade name; Apex had no right to use that trade name. *Id*. at § 2(c). The provision applies only to the use of the trade name MegaSparkles and does not limit the use by either party to the composition of the product sold as MegaSparkles. *Id*. Apex further received the right to retain and use all those assets of Finos that it had in its possession or control. *Id*. at § 2(f). Zalani testified that this meant all the sales and marketing records and distribution information for Finos. (Tr. Vol. 1, at 65-66). The Settlement Agreement did not address an allocation of product specifications, standards, testing methods,

laboratory equipment or other items; Zalani testified that this was because those assets were never transferred from Apex to Finos. (Tr. Vol. 1, at 66-67).

A few months earlier, in September 2012, while overseas on Apex business, Zalani received an email from Bykowski indicating that he was resigning from Apex. *Id*. at 68. Bykowski subsequently resigned from Finos as well. *Id.* at 174. While overseas, Zalani had a telephone conversation with Bykowski during which Bykowski stated he had in his possession the powder standards used in Apex's business. *Id*. at 75.

Upon return to the United States, Zalani found that, other than equipment, the lab was empty and that the powder standards, as well as Apex's records from the duration of its operations, except for one box of test records, were missing. *Id*. at 71-72, 76. Zalani testified that the absence of the powder standards and business records shut down Apex's laboratory. *Id*. at 76.

On October 15, 2012, Bykowski wrote an email to a former customer of Finos disclosing that Chemworld had been that customer's supplier for the previous few years, that Bykowski no longer worked for Finos but would be selling directly for Chemworld, and that Bykowski would provide the customer with the same quality (meaning tolerances and specifications) and the same testing through his lab. *Id*. at 174, 213-215; (Ex. 97). Atul Modi was copied on the email. (Ex. 97). At that time, Bykowski did not yet have his own laboratory funded by Chemworld. (Tr. Vol. 1, at 215). The customer responded, "As I understand it, Finos materials will now be Chemworld materials. These are exactly the same materials that we've been getting for many years. This is only a name change and not a product change." *Id*. at 217; (Ex. 97). Bykowski did not correct the customer's understanding because Bykowski was in fact using the same material, same product specifications, test methods, and supplier. (Tr. Vol. 1, at 218). The same was discovered to be true with another customer as well. (Tr. Vol. 2, at 348). From the time of his resignation and prior to October 31, 2012, Bykowski was asked not to use the Apex laboratory in Portage, Indiana. *Id.* at 80, 189-90.

On October 31, 2012, Zalani and Bykowski met to discuss Bykowski's relationship with Apex. (Tr. Vol. 1, at 80). Zalani testified that, on that date, Bykowski agreed to return to work for Apex, executed a new Employment Confidentiality Agreement, and began working for Apex. (Tr. Vol. 1, at 77-79; 159); (Ex. 12). Bykowski testified that Zalani required him to sign the Confidentiality Agreement on October 31, 2012, before Zalani would discuss employment with Bykowski. (Tr. Vol. 1, at 189). The Employment Confidentiality Agreement defined "Confidential Information" as "any trade secrets or information known to Employee as a result of his/her employment with Employer, at any time *after* the date of this Agreement (including information originated by Employee) . . . ." (Ex. 12) (emphasis added).

Bykowski's compensation from Apex could not begin until after Finos' dissolution because Apex could not start its business until the dissolution. (Tr. Vol. 1, at 97). Until that time, Bykowski was to operate Apex's Portage, Indiana, laboratory and certify products, including testing and establishing products for sale. *Id*. at 77-78, 81. In November and December 2012, Bykowski ordered and received pre-shipment samples of inventory to be tested in order to restart Apex's business. *Id*. at 80-81, 189. However, Bykowski did not do any testing for Apex because Apex did not have the proper product identification. *Id*. at 199. Bykowski was not authorized by Apex to use Apex's laboratory for testing and certification for Apex's competitors during this time. (Tr. Vol. 1, at 82). After October 31, 2012, Bykowski did not bring back the powder standards he took from Apex or his personal laptop computer on which he had previously conducted Apex's business. *Id*. at 190. It appears that Bykowski was not paid by Apex after October 31, 2012. *Id*. at 97.

In November and December 2012, Bykowski did pigment testing at the Apex laboratory on behalf of Chemworld. (Tr. Vol. 2, at 290, 291). Bykowski testified that he had Zalani's permission to do so. *Id*. at 190. On December 18, 2012, Bykowski sent an email to a customer identifying color names that would replace those used at Finos and stating to the customer that Chemworld had

already been his source for the dyes so the customer would be receiving the same supply source, that Bykowski had the same lab, and that Bykowski was using the same standards and testing procedures. (Ex. 98) ("Attached are the colors that we would replace (the old FINOS LLC)."). Modi was copied on this email. *Id*. Bykowski recognized that, by making these representations to the customer, Chemworld would not have to go through the qualification process with this customer. (Tr. Vol. 1, at 218-20).

On December 31, 2012, Bykowski resigned from Apex for the second time. *Id*. at 83. Subsequently, Zalani went to the Portage, Indiana, laboratory and discovered that, other than the equipment, it was empty. *Id*. The color computer used as part of the color certification process was not there. *Id*.

In January or February 2013, Bykowski opened the new laboratory in Portage, Indiana, with Chemworld paying two-thirds of the rent. *Id*. at 199; (Vol. 2, at 399-400). In the new laboratory, Bykowski used the same personal laptop computer he previously used when working for Apex. (Tr. Vol. 1, at 202). In July 2013, Chemworld was using a product certification format that was identical to the product certification format used originally at Apex and then at Finos, including the six-digit standard lot number for a color. (Tr. Vol. 2, at 266-275); (Exs. 40, 41, 59). However, Zalani complained and Bykowski changed the format of the product certifications. *Id*. at 203.

In 2013, Doug Thompson, who was employed by W.B. Tabler at the time (but was employed by Apex at the time of the hearing before this Court in April 2015), was invited to meet Bykowski at his new laboratory in Portage, Indiana. (Tr. Vol. 2, at 415). During the visit, Thompson observed that the laboratory equipment type and models were generally identical to those in the Apex laboratory. *Id*. at 416. Thompson also observed powder standard jars with the Finos label on them as well as a Finos chip book with samples. *Id*.

After Bykowski left Apex the second time and began to sell for Chemworld, he informed Finos' former customers that he could obtain the same product and disclosed the name of the customers' supplier as Chemworld. (Tr. Vol. 1, at 205). Since his second resignation, Bykowski has been selling a product called MeraSparkles, which is the same product as MegaSparkles. *Id.* at 223-224. In February 2013, Bykowski used a book he took from the Portage, Indiana, laboratory with MegaSparkles samples. (Tr. Vol. 2, at 255-57). Bykowski considers the MeraSparkles formulation to be proprietary. (Tr. Vol. 2, at 259).

Based on the evidence presented at the April 2015 hearing, the Court finds that the powder standards used by Bykowski at Apex and later Finos were brought by Bykowski to Apex when Bykowski left PolySolve.

Bykowski testified that when he left Apex and Finos in September 2012, he did not take test data with him. (Tr. Vol. 1, at 205). However, at least three product certifications from Chemworld after September 2012 had identical test results to previous Finos products from several years earlier, some even with the same testing time of day–Solvent Blue 35, Solvent Blue 104, and Solvent Yellow 33.

On August 31, 2010, Apex tested a batch of Solvent Blue 35 supplied by Chemworld at the Apex laboratory in Portage, Indiana. (Ex. 35) ("batch data report"). The testing was done for Finos. (Tr. Vol. 2, at 279). On January 15, 2013, Chemworld issued a product certification for the same Chemworld Solvent Blue 35, which was certified by Bykowski. (Ex. 70). Both the August 2010 product and the January 2013 product had the same standard lot number. (Tr. Vol. 2, at 279). Bykowski testified that both were based on his powder standards. *Id.* Both had identical color data test results. *See* (Exs. 35, 70). Bykowski testified that he did not copy the information from the 2010 test and use it for the 2013 test. (Tr. Vol. 2, at 281). Doug Thompson testified that in more than twenty years of running color tests, he has never seen two tests where all the data results match; he

stated that it would be "near impossible." *Id*. at 434-35. Apex did not offer into evidence a product certification for the Solvent Blue 35 test run in 2010.

On June 3, 2008, Finos issued a product certification for FinoPlas Solvent Blue 104 at the laboratory in Portage, Indiana. (Ex. 78) ("Finos Product Certification"). The test was run by someone who worked for Bykowski at Apex, and the test data was approved by Bykowski. (Tr. Vol. 2, 284). On February 4, 2013, Chemworld issued a product certification for a Solvent Blue 104, which was certified by Bykowski. (Ex. 63) ("Chemworld Product Certification"). Both product certifications listed the same time of day: 10:20. (Ex. 63, 78). The products do not have the same standard lot number, but all the data on the product certifications is identical. (Ex. 63, 78). Bykowski testified that it is possible to have the same test results. (Tr. Vol. 2, 285). However, in this instance, Bykowski testified that it appeared that he copied the information from the 2008 Finos product certification to use on the 2013 Chemworld product certification. *Id*.

On December 15, 2004, Finos issued a product certification for FinoPlas Solvent Yellow 33 at the Apex laboratory in Portage, Indiana. (Ex. 80) ("Finos Product Certification"). On March 12, 2013, Chemworld issued a product certification for a Solvent Yellow 33, which was certified by Bykowski. (Ex. 68) ("Chemworld Product Certifiation"). Both product certifications list the identical six-digit lot number developed at Apex, the tests were done at the same time of day (12:54), and all of the data from the test results is identical. (Tr. Vol. 2, at 287); (Exs. 68, 80). Bykowski testified that it appeared he moved the data from the December 2004 Finos product certification to the March 2013 Chemworld product certification. (Tr. Vol. 2, at 288). Bykowski testified that he had the Finos test data in some form in his possession at that time. *Id*. at 289.

The Court finds that Bykowski had some Finos test data as found on product certifications in his possession after he left his employment with Apex and that Bykowski copied test results from

the Finos product certifications and used them for Chemworld product certifications. Bykowski does not claim ownership of test data from one test batch to the next. (Tr. Vol. 1, at 188).

On November 10, 2011, Bykowski used the test data generated in Apex's lab in Portage, Indiana, on a Chemworld product certification for Pigment Yellow 6211. (Exs. 106, 107). It appears that this test was performed directly for Chemworld for a pigment, which Bykowski testified Finos would not sell; there is no comparable product certification or batch data report for a Pigment Yellow 6211 from Finos. At the time, Bykowski was president of Apex and was compensated for services as Apex's lab manager through Finos. (Tr. Vol. 1, at 32-43, 124-25, 163-64, 195-201); (Exs. 106, 107, 118).

As for test procedures, Bykowski testified that there were slight variations between the test procedures he developed at PolySolve and at Apex. (Tr. Vol. 2, at 260). Apex identified two differences in test procedures. First, the two laboratories used different brands of molding machines. *Id*. at 261. Second, one of the specifications listed on Apex's data sheet was not one of the specifications listed on PolySolve's batch data sheet. (Tr. Vol. 2, at 296); (Ex. 2, 13 pages from the back) (PolySolve Batch Data sheet dated March 29, 2000); (Tr. Vol. 3, at 490-92); (Ex. 2, 30 pages from the back) (PolySolve Batch Data sheet dated April 26, 2000); (Ex. 40) (batch data sheet dated August 3, 2007, from the Portage, Indiana, laboratory). The Court finds that the test procedures used at Apex and later Finos were developed by Bykowski at PolySolve and brought with him to Apex.

Bykowski testified that the product specifications he is currently using at Chemworld are the same as those he used at Finos and before that at PolySolve. (Tr. Vol. 1, at 230). Apex offered evidence comparing the tolerances for the specifications of Solvent Red 24 between PolySolve, Apex/Finos, and Chemworld. When comparing the four product specifications identified by Apex of Solvent Red 24 at PolySolve, Apex/Finos, and Chemworld, the tolerances for those four specifications for Apex/Finos and Chemworld were identical whereas the tolerances for PolySolve

were slightly different. *Id*. at 230-238; (Ex. 2, twelve pages from the back) (PolySolve); (Ex. 20) (Apex/Finos); (Exs. 22, 94) (Chemworld). However, the tolerances for three other specifications were identical for PolySolve, Apex/Finos, and Chemworld. *Id*. The Court finds that the product specifications and tolerances were developed by Bykowski at PolySolve and brought with him to Apex.

On April 9, 2012, Apex filed a trademark application for MegaSpecks. (Ex. 14). On August 27, 2013, the United States Patent and Trademark Office registered Apex's trademark for MegaSpecks (Ex. 14). The trademark certificate indicates that the trademark was used in commerce since April 3, 2002. *Id*. The trademark is for "chemicals for rubber and plastics processing applications; chemicals for use in the manufacture of coatings, paints and clear top coat sealants which creates an aesthetic simulated granite appearance or speckled effect for rubbers, plastics, coatings, cements and solid surfaces; specialty chemicals, namely chemical additives for general industrial use in the manufacture of a wide variety of goods; unprocessed plastics in all forms." *Id*.

After Bykowski left Apex/Finos and was working as an independent sales representative for Chemworld, Bykowski represented to a customer of Chemworld's (a former customer of Finos' who had previously purchased MegaSpecks and MegaSparkles) that Chemworld's product "MeraSpecks" was the same as "MegaSpecks" and that Chemworld's "MeraSparkles" was the same as "MegaSparkles." (Tr. Vol. 2, at 349-50, 358). There is no evidence that this conversation occurred after August 27, 2013. There is no evidence in the record that the customer bought either "MeraSpecks" or "MeraSparkles" from Chemworld. *Id*. at 358.

During this litigation, Bykowski produced documents in his possession containing customer and supplier financial and business information of Apex from 2012. (Tr. Vol. 1, at 238-46); (Ex. 91, 92, 93).

Some former Finos customers are now Chemworld customers through Bykowski's efforts. (Tr. Vol. 1, at 246); (Exs. 97-98). To one of these customers, Bykowski disclosed Chemworld as a Finos product supplier. (Tr. Vol. 1, at 212-13, 218); (Ex. 98). With one customer, Chemworld was able to avoid the full qualification process to become a supplier because Bykowski represented to the customer that Bykowski was providing the same test methods, sources, standards, and specifications that he had formerly provided through Finos. (Tr. Vol. 2, at 348-49).

By May 2014, with Doug Thompson as his technical director, Zalani had reestablished Apex's inventory and began contacting Apex's customers. (Tr. Vol. 1, at 86). Apex was unable to get back into the sales market because the customers thought Bykowski "was Apex." *Id.*

## CONCLUSIONS OF LAW

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotation marks omitted) (quoting 11A C. Wright, A Miller & M. Kane, Federal Practice and Procedure § 2948, pp. 129-30 (2d ed. 1995)); *see also Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of America, Inc.*, 549 F.3d 1079, 1085-86 (7th Cir. 2008). A party seeking a preliminary injunction must show that it has "(1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits." *Wisconsin Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014) (internal quotation marks omitted) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011)). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's repeated] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek*, 520 U.S. at 972).

Once this showing is made, "the court weighs the competing harms to the parties if an injunction is granted or denied and also considers the public interest." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). The "equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor." *Id.*

In the instant motion, Apex seeks a preliminary injunction on three of its claims: (1) misappropriation of a protectible trade secret under the Indiana Trade Secrets Act, (2) unfair competition under Indiana law, and (3) federal trademark infringement. Because Apex has failed to demonstrate a likelihood of success on the merits of the three claims, the Court denies the motion.[1]

*1.     Misappropriation of Trade Secrets*

a.     Trade Secret

Under Indiana law, a "protectible trade secret has four general characteristics: 1) information; 2) deriving independent economic value; 3) not generally known, or readily ascertainable by proper means by others who can obtain economic value from its disclosure or use; and 4) the subject of efforts, reasonable under the circumstances, to maintain its secrecy." *Burk v. Heritage Food Serv. Equip., Inc.*, 737 N.E.2d 803, 813 (Ind. Ct. App. 2000); Ind. Code § 24-2-3-2 (Indiana Trade Secret Act definition of "trade secret."). To determine whether reasonable efforts to maintain secrecy were taken,

> the court must look at specific facts. Where a company keeps design documents in a secure area and maintains password protection on the computers storing the information, has its employees sign confidentiality agreements, marks some design documents as confidential, but takes no action to protect the confidentiality of design documents given to another company, information in the design documents is not a trade secret. Where machinery is not visible from outside the building, an employee

---

[1] The Court previously ordered that it would consider an adverse inference that documents contained on Bykowski's lost laptop computer would be favorable to Apex. The Court has taken this adverse inference into account in making this ruling.

Once this showing is made, "the court weighs the competing harms to the parties if an injunction is granted or denied and also considers the public interest." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). The "equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor." *Id.*

In the instant motion, Apex seeks a preliminary injunction on three of its claims: (1) misappropriation of a protectible trade secret under the Indiana Trade Secrets Act, (2) unfair competition under Indiana law, and (3) federal trademark infringement. Because Apex has failed to demonstrate a likelihood of success on the merits of the three claims, the Court denies the motion.[1]

*1.     Misappropriation of Trade Secrets*

a.     Trade Secret

Under Indiana law, a "protectible trade secret has four general characteristics: 1) information; 2) deriving independent economic value; 3) not generally known, or readily ascertainable by proper means by others who can obtain economic value from its disclosure or use; and 4) the subject of efforts, reasonable under the circumstances, to maintain its secrecy." *Burk v. Heritage Food Serv. Equip., Inc.*, 737 N.E.2d 803, 813 (Ind. Ct. App. 2000); Ind. Code § 24-2-3-2 (Indiana Trade Secret Act definition of "trade secret."). To determine whether reasonable efforts to maintain secrecy were taken,

> the court must look at specific facts. Where a company keeps design documents in a secure area and maintains password protection on the computers storing the information, has its employees sign confidentiality agreements, marks some design documents as confidential, but takes no action to protect the confidentiality of design documents given to another company, information in the design documents is not a trade secret. Where machinery is not visible from outside the building, an employee

---

[1] The Court previously ordered that it would consider an adverse inference that documents contained on Bykowski's lost laptop computer would be favorable to Apex. The Court has taken this adverse inference into account in making this ruling.

handbook instructs employees to keep information about the machinery confidential, signs are posted barring visitors from the machines' location and instructing employees not to disclose information about the machines, but there are no confidentiality agreements with employees or outsiders who see the machinery (including outsiders who were specifically shown the machines), the machinery's design is not a trade secret. In contrast, where a company limited access to its facility through a security system; limited access to information by keeping it under lock and key and distributing it only on a limited basis to individuals who needed it; and depended on longstanding trusting relationships with employees rather than explicit confidentiality agreements, the company had taken reasonable steps to assure security so that the relevant information was a trade secret.

*Coleman v. Vukovich*, 825 N.E.2d 397, 405-06 (Ind. Ct. App. 2005) (internal citations omitted).

As an initial matter, the Court notes facts that detract from the reasonableness of Apex's efforts to maintain the secrecy of its alleged trade secrets. *See Zemco Mfg., Inc. v. Navistar Int'l Transpo. Corp.*, 759 N.E.2d 239, 246 (Ind. Ct. App. 2001) ("What is 'reasonable' under the facts of one case may be considered inadequate under the facts of another."), *trans. denied*. First, Bykowski did not have a dedicated Apex email address on a secure or securable server and instead used a hotmail.com or frontier.com email address. Bykowski testified that some of the Apex documents he disclosed in discovery in this case were in his possession because they were attached to emails to which he still had access. Although this is not a case in which a third party obtained confidential information through unsecured emails, the fact that Bykowski was able to access emails after he left Apex and Finos made it possible for him to later use the documents and information in those emails.

Second, it appears that Finos, a separate business entity from Apex, was either given or had access to the information that Apex now seeks to identify as confidential, and there is no evidence that Finos was a party to a confidentiality agreement. Bykowski had no employment agreement or confidentiality agreement with Finos, yet Finos paid his salary from 2005 to 2012. Bykowski issued certifications on behalf of Finos for at least that period of time. Finos developed and marketed

MegaSpecks and MegaSparkles. Although Zalani testified that the other members of Finos did not have access to supply chain information, (Tr. Vol. 1, at 61), the members of Finos had access to the Portage, Indiana, laboratory, and Finos is the entity that obtained ISO certification for the laboratory.

In its proposed Conclusions of Law, Apex pursues its claim of misappropriation of the following trade secrets: (1) powder standards; (2) product specifications; (3) test data; (4) the products MegaSpecks and MegaSparkles; (5) customer lists; and (6) supplier lists. The Court considers whether Apex has a likelihood of success in showing that each is a trade secret.

1)      Powder Standards

The Court has made the factual finding based on the evidence presented at the hearing that the powder standards used by Bykowski in the Portage, Indiana, laboratory were the powder standards Bykowski removed from PolySolve and brought to Apex. Thus, Apex is not likely to succeed on its claim that the powder standards are its trade secret.

2)      Product Specifications

The Court has made the factual finding that Bykowski, and not Zalani, brought product specifications, including tolerances, with him from PolySolve and used those specifications at Apex. Apex did not offer evidence that Apex independently developed acceptable tolerances in approving raw materials once the laboratory was set up. The minor adjustment to some of the specifications for Solvent Red 24 from those Bykowski used at PolySolve to those he continued to use at Apex/Finos and then used for Chemworld do not change this finding. Thus, the product specifications are not Apex's trade secret. Bykowski also argues that the product specifications were Finos' because the product certifications issued from the Portage, Indiana, laboratory were issued with the name "Finos" rather than "Apex" at the top, and Bykowski did not have an employment agreement with Finos. However, the Court finds that the testing was done by Apex, and the evidence of record is that Apex did not transfer testing procedures or product specifications to Finos.

Nevertheless, Apex is not likely to succeed on the merits of its claim that testing procedures were its trade secrets because they were brought by Bykowski.

3)    Test Data

Apex has identified four instances of test data that Bykowski used for Chemworld. The first two instances are test data that Bykowski included in a Chemworld product certification that was identical to the data previously included in a Finos product certification. *See* (Ex. 78) (FinosPlas Solvent Blue 104); (Ex. 63) (Chemworld Solvent Blue 104); (Ex. 80) (FinoPlas Solvent Yellow 33); (Ex. 68) (Chemworld Solvent Yellow 33); (Apex Findings of Fact and Conclusions of Law ¶ 45). The third instance is based on a 2010 batch data report from the spectrophotometer at the Portage, Indiana, laboratory for Solvent Blue 35, that contains data that is identical to the data in the Chemworld product certification for Solvent Blue 35 dated January 13, 2013. (Exs. 35, 70).

The test data was produced by Bykowski or one of the laboratory employees supervised by Bykowski during the course of their work and was generated in furtherance of Apex's business. (Ex. 11). "Data" is identified as Confidential Information in Bykowski's 2001 Employment Agreement. (Ex. 11). Bykowski did not bring the test data with him from PolySolve. Bykowski is correct that anyone who could obtain a sample of the same manufacturer's product could test the product against a standard and obtain test data; however, the specific data produced by those tests would not be the same data produced by the tests run in the Portage, Indiana, laboratory in the course of furthering Apex's business. Although the powder standards at Apex against which the manufacturer's product were tested were brought by Bykowski to Apex, the test data belongs to Apex. The Court further finds that the exception for "information originated by" Bykowski in the definition of "Confidential Information" in the 2001 Employment Agreement does *not* include the results of testing performed by Bykowski at the Apex laboratory in the course of his employment, as such an interpretation would be in direct conflict with the remainder of the definition of "Confidential Information."

The fourth instance of test data is one Chemworld product certification for Pigment Yellow 6211 dated November 10, 2011. There is no comparable Apex or Finos batch data report or product certification for Pigment Yellow 6211; based on the record, Apex did not certify pigments. Thus, Bykowski did not use test data that was produced for a customer of Apex. Rather, the evidence is that Bykowski issued the product certification for Pigment Yellow 6211 directly to Chemworld and earned a commission, which he did not disclose to or share with Apex. Thus, the test data was not produced for Apex's business. Nevertheless, the definition of Confidential Information in the 2001 Employment Agreement also includes work product of Bykowski developed "during the work hours of" his employment. (Ex. 11, ¶ 1.2.a). Although Apex has not attempted to show that the test results leading to the product certification were done during Bykowski's "work hours," the certification has the time of "11:20" on a Thursday. Thus, there is an argument that, under the Employment Agreement, the test data could be considered to be Apex's. Notably, there is no evidence that Bykowski shared any test data other than the color data that was contained in the Chemworld product certifications.

Nevertheless, Apex did not take reasonable steps to maintain the secrecy of the data that it asserts Bykowski misappropriated. Apex had confidentiality agreements with Bykowski and Deehan, and Bykowski had Thompson sign a confidentiality agreement when he came to the Portage, Indiana, laboratory. A code was required to enter the laboratory and the computers were password protected. However, the data was available to Finos, which was a separate business entity–a limited liability company comprised of Apex, Eric Boggess, and Jim Boggess. There is no evidence of any confidentiality agreements with Finos. The product certifications from which data was copied were issued in the name of Finos, not Apex. The Portage, Indiana, laboratory was ISO certified through Finos. Finos paid for the laboratory rent and paid the salaries of the laboratory employees. The data contained within the Finos product certifications was shared with Finos

customers who received those product certifications; there was no confidentiality agreement between Apex and/or Finos with Finos' customers. The Court finds that Apex did not take reasonable steps to maintain the secrecy of the test data. As a result, Apex is not likely to succeed in demonstrating that this test data was its trade secret.

4)      MegaSpecks and MegaSparkles

Through the dissolution of Finos, Apex received the exclusive right to use the product names and the formulations for the product known as MegaSpecks. (Ex. 13, § 2(a)). Bykowski testified that he does not know the formulation for MegaSpecks. Although one customer testified that Bykowski told him that "MeraSpecks" was "MegaSpecks," there is no evidence that Bykowski or Chemworld had the formulation for MegaSpecks. Although the formulation was originally Finos' prior to Finos' dissolution, Apex obtained the formulation after Finos' dissolution, and there is no evidence that Apex did not take reasonable steps to protect the formulation after early 2013. Thus, it appears that Apex likely will be successful in showing that the formulation of the MegaSpecks product is Apex's trade secret. However, as discussed in the next section, Apex has not offered any evidence that Defendants misappropriated the MegaSpecks formulation.

In contrast, Apex has not demonstrated that the composition of MegaSparkles is its trade secret. MegaSparkles was a product purchased "off the shelf" from another company that Finos labeled with the name MegaSparkles. Although Zalani testified that it was his expectation that the source of the MegaSparkles product not be disclosed, MegaSparkles was a product developed and sold by Finos, not Apex. As discussed above, Bykowski did not have a confidentiality agreement with Finos, and there is no evidence that Finos was a party to a confidentiality agreement. In addition, the Finos dissolution agreement gave the Boggesses the exclusive right to use the product name "MegaSparkles" and *neither* Apex nor Finos received the exclusive right to use the

composition of the product MegaSparkles. Therefore, Apex is not likely to succeed in demonstrating that the composition of MegaSparkles is its trade secret.

        5)      Customer Lists

Apex did not offer any evidence of a specific customer list at the hearing. Moreover, Apex transferred its customer list to Finos when Finos was created in 2002. And, the Confidential Information provision of Bykowski's 2001 Employment Agreement provides that all customers developed by Bykowski are *not* Confidential Information; Bykowski testified that Finos' customers were customers that he developed. Apex has not offered any evidence that it independently developed any customers. The Court finds that Apex is not likely to succeed on the merits of its claim that its customer list was a trade secret.

        6)      Supplier Lists

Apex has not identified supplier information that Bykowski took from Apex and used for Chemworld other than Bykowski's disclosure to a customer that Chemworld had been a former supplier for Finos. Again, Finos was a separate company from Apex and had access to this same supplier information. There was no confidentiality agreement with Finos. Thus, Apex did not reasonably secure the information of this aspect of its domestic supply chain, and the Court finds that Apex is not likely to succeed on the merits of its claim that the identity of Chemworld as a Finos supplier was Apex's trade secret.

b.      Misappropriation under the Indiana Trade Secrets Act

Misappropriation is defined under the Indiana Trade Secrets Act to mean the:

> (1) *acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means*; or
> (2) *disclosure* or use of a trade secret of another without express or implied consent by a person who:
>> (A) used improper means to acquire knowledge of the trade secret;
>> (B) *at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was*:

(i) derived from or through a person who had utilized improper means to acquire it;

(ii) *acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use*; or

(iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ind. Code § 24-2-3-2 (emphasis added).

As set forth in the previous section, Apex has shown a likelihood of success of proving a trade secret only as to the formulation of MegaSpecks. However, Apex has not shown that Defendants misappropriated the formulation for Megaspecks. Bykowski testified that he does not know and has never known the formulation for MegaSpecks. Bykowski testified that he does not currently sell a product with the same formulation as MegaSpecks. Apex has not offered any evidence that Bykowski or the Chemworld Defendants possess the formulation for MegaSpecks or that they are selling a product made with the MegaSpecks formulation. Thus, Apex has not shown that Bykowski had "knowledge" of the MegaSpecks formulation to "disclose" to the Chemworld Defendants, *see* Ind. Code § 24-2-3-2(2)(b), or that the Chemworld Defendants "acquired" the MegaSpecks formula, *see* Ind. Code § 24-2-3-2(1). The Court concludes that Apex is not likely to succeed on the merits of demonstrating that Defendants misappropriated the formulation for MegaSpecks.

Therefore, Apex is not likely to succeed on the merits of its claim of misappropriation of trade secrets under the Indiana Trade Secrets Act based on the evidence before the Court.

2.     *Unfair Competition*

"The tort of unfair competition is premised upon the rationale that a person who has built up good will and reputation for his business is entitled to receive the benefits from his labors."

*Hammons Mobile Homes, Inc. v. Laser Mobile Home Transp., Inc.*, 501 N.E.2d 458, 461 (Ind. Ct. App. 1986) (citing *Hartzler v. Goshen Churn and Ladder Co.*, 104 N.E. 34, 37 (1914)). The Indiana Supreme Court has recognized that the tort of unfair competition may arise from various factual scenarios, including "any conduct, the natural and probable tendency and effect of which is to deceive the public so as to pass off the goods or business of one person as and for that of another." *Felsher v. Univ. Evansville*, 755 N.E.2d 589, 598 (Ind. 2001) (citing *Hartzler v. Goshen Churn & Ladder Co.*, 55 Ind. App. 455, 104 N.E. 34, 37 (1914)). The "passing off" form of unfair competition requires a showing of intentional deception by the defendant. *Keaton & Keaton v. Keaton*, 842 N.E.2d 816, 819 (Ind. 2006).

Apex is seeking a preliminary injunction based on "passing off," arguing that Bykowski has represented to customers in the plastics, inks, and coatings industries that the Chemworld Defendants and Bykowski are the successors to Apex's product standards and specifications as well as Apex's proprietary products MegaSpecks and MegaSparkles.

However, there is no evidence that Bykowski attempted to deceive Chemworld's customers as to the source of the products. Rather, the evidence is that Bykowski told customers either that the same product that they had previously bought from Finos could now be purchased through Bykowski from Chemworld or that Bykowski could obtain products for the customer through Chemworld that were the equivalent of the products they had purchased from Finos. Bykowski told one customer that many of the sources, test methods, standards, and specifications would be the same on products previously purchased from Finos if the customer began purchasing through Bykowski. All of the representations made by Bykowski appear to be true. Finos was dissolving, and Apex had not supplied an "Apex" colorant to any customer since at least 2005. There is no evidence that Bykowski attempted to deceive a customer as to the source of the products. *See, e.g.,*

*Meridian Fin. Advisors, Ltd. v. Pence*, 763 F. Supp. 2d 1046, 1065 (S.D. Ind. 2011). Accordingly, Apex is not likely to succeed on the merits of its claim of unfair competition based on "passing off."

3.      *Trademark Infringement–MegaSpecks*

Apex brings a claim of trademark infringement under 15 U.S.C. § 1114 for Defendants' alleged use of "MegaSpecks" and "MeraSpecks" in connection with Defendants' sale of products that provide aesthetic simulated granite effects. On April 9, 2012, Apex filed a trademark application for "MegaSpecks," and the registration was issued on August 27, 2013.

To prevail on a trademark infringement claim, Apex must show that (1) its mark is protectable and (2) Defendants' use of the mark is likely to cause confusion among consumers. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000).[2] Trademarks are not created by federal statute or registration but rather by use. *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1299 (2015) (internal citations omitted) (citing *In re Trade–Mark Cases*, 100 U.S. 82, 92 (1879)). As the United States Supreme Court recently reiterated: "One who first uses a distinct mark in commerce thus acquires rights to that mark. Those rights include preventing others from using the mark." *Id.*

Nevertheless, registration under the Lanham Act creates a rebuttable resumption that the trademark is valid. *Georgia-Pacific Consumer Prods. LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727 (7th Cir. 2011). Under the Act, "[a]ny registration . . . of a mark *registered* on the principal register provided by this chapter and owned by a party to an action shall be admissible in evidence and *shall be prima facie evidence of the validity of the registered mark* and of the registration of the

---

[2] Seven factors are considered in assessing the likelihood of confusion: "(1) the similarity of the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be used by consumers; (5) the strength of the plaintiff's mark; (6) whether any actual confusion exists; and (7) the defendant's intent to palm off its goods as those of the plaintiff[]." *Ty Group, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001) (citing *Helene Curtis Indus., Inc. v. Church & Dwight Co., Inc.*, 560 F.2d 1325, 1330 (7th Cir. 1977)).

mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein . . . ." 15 U.S.C. § 1115(a) (emphasis added).

In the Amended Motion for Preliminary Injunction as well as its proposed Conclusions of Law, Apex asserts the validity of its trademark based solely on the August 27, 2013 registration. (Am. Mot. Prelim. Inj. 18-19). However, there is no evidence that Bykowski or the Chemworld Defendants marketed either "MegaSpecks" or "MeraSpecks" after the August 27, 2013 registration date. Bykowski told a former Finos customer that MegaSpecks and MeraSpecks were the same product; but there is no evidence as to when that statement was made. Moreover, that customer produced to Apex documents sought by subpoena on this issue in this litigation, and Apex has not offered any evidence that any customer bought a MegaSpecks or MeraSpecks product from Chemworld either before or after August 27, 2013. Thus, because Apex has not shown that Defendants used the trademark MegaSpecks or the product name MeraSpecks after the trademark for MegaSpecks was registered to Apex on August 27, 2013, Apex has not shown a likelihood of success on the merits on its trademark infringement claim.

Nor has Apex made any legal or factual argument that Apex acquired the trademark for MegaSpecks through use prior to the August 27, 2013 registration date. *See Zazú Designs v. L'Oréal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992) ("A party may acquire a protectable right in a trademark only through use of the mark in connection with its product." (citing *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 433 (7th Cir. 1999))). The evidence of record is that Finos, not Apex, was using the trademark until Finos' dissolution in early 2013. Nor does Apex address whether there was an assignment of ownership (and, thus, of rights) of that trademark through Finos' dissolution. *See TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 884 (7th Cir. 1997) (discussing requirements for proving assignment of a trademark).

Because the Court finds that, on the evidence presented, Apex has not demonstrated a likelihood of success on the merits of the three claims, the Court need not consider the remaining factors of whether Apex has an adequate remedy at law, whether Apex will suffer irreparable harm, and balancing the harms to the parties and the public.

## CONCLUSION

Based on the foregoing, the Court hereby **DENIES** Apex Colors, Inc.'s Amended Motion for Preliminary Injunction [DE 197].

SO ORDERED this 30th day of June, 2015.

 s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT