# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| APEX COLORS, INC. )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>CHEMWORLD INTERNATIONAL LIMITED, )<br>INC., CHEMWORLD INTERNATIONAL )<br>LIMITED, LLC, ATUL MODI, MANOJ MODI, )<br>and PAUL BYKOWSKI, )<br>    Defendants. ) | Cause No.: 2:14-CV-273-PRC |

## OPINION AND ORDER

This matter is before the Court on a Motion to Reconsider ESI Order of September 13, 2016, or in the Alternative for a Protective Order Against Plaintiff's Request for Production No. 11 [DE 401], filed by Defendants Chemworld International Limited, Inc., Atul Modi, and Manoj Modi (collectively "Chemworld") on September 20, 2016. Plaintiff Apex Colors, Inc. ("Apex") filed a response on October 4, 2016, and Chemworld filed a reply on October 18, 2016. For the reasons set forth below, the Court denies the motion but provides clarification of its September 13, 2016 ESI Order.

## BACKGROUND

Early in this litigation, Apex served Chemworld with Request for Production No. 11, which requests:

> 11. Any and all communication between you and any of the following: Chemworld, Chemworld, LLC, Atul [Modi], Manoj [Modi], Paul Bykowski, Tom Daquila and/or Craig Weadon regarding customers and/or former customers of Apex and/or Finos.

On January 22, 2015, the Court issued an Opinion and Order on a Motion to Compel filed by Apex on January 9, 2015, ordering Chemworld, in relevant part, to respond to the Request for Production No. 11.

As described in that January 22, 2015 Order, some of Apex's relevant allegations at that time were that Bykowski was "competing with Apex on behalf of Chemworld by providing Chemworld with Apex's 'standard lot numbers, forms, customer lists, pricing information, test methods, documents, marketing materials, product and certification history, supplier lists and by performing product certification on their behalf, using Apex's proprietary color standards and methods.'" (ECF 156 (quoting Compl. ¶ 40)). Regarding Request for Production No. 11, the Court found that the request "seeks documents that may support Plaintiff's allegation that each person involved was part of a civil conspiracy to misappropriate Plaintiff's 'trade secrets' and business." *Id*. The Order did not place a time frame on the discovery; however, the original Complaint alleged activity for the time periods of 2008 through 2013.

In May 2016, counsel for Apex began preparing for Chemworld depositions scheduled for July 2016. Apex's counsel, who was not counsel of record at the time Chemworld initially produced documents following the Court's January 22, 2015 Order, discovered that Chemworld's production was limited to the 2014-2015 time frame. Counsel for Apex believed that the discovery production should be from 2008 through 2013 based on the allegations of the Complaint. A series of discussions between counsel for the parties and then between counsel and each party's computer expert led to an agreement in June 2016 for the Chemworld computers in New Jersey to be imaged locally by someone in New Jersey and have those copies sent to Chemworld's expert, who would then make a copy for Apex's expert. The experts would develop a joint search protocol, and the attorneys

would develop a list of search terms. On June 30, 2016, Chemworld withdrew from the agreement, with Atul and Manoj Modi objecting to the cloning of the entire hard drives. Chemworld advised that it was not willing to have the hard drives copied without an ESI protocol in place, noting that the hard drives contain ESI that is irrelevant to the litigation.

On July 5, 2016, Apex filed a Motion for Order to Show Cause Why the Chemworld Defendants Should Not Be Held in Contempt for Failing to Comply with This Court's January 22, 2015 Order and for Sanctions. Therein, Apex argued that the email production by Chemworld in response to Request for Production No. 11 was artificially limited in time to the 2014-2015 time frame. In paragraph 17, Apex argued:

> The Court's January 22, 2015 Order was express and unequivocal: It ordered the Chemworld Defendants to comply with RFP #11 seeking communications related to customers and/or former customers of Apex or Finos. It also ordered the Chemworld Defendants to answer a number of other discovery requests. (DE 156). That order was not limited in time and yet the Chemworld Defendants['] email production was from the 2014-2015 time period. Again, the critical years in these consolidated cases are the 2008-2013 time period.

(ECF 386 ¶ 17). In the conclusion of the motion, Apex sought, in part, "the imaging of all Chemworld's computers/hard drives for the purpose of locating pre-2014 emails and any other pre-2014 documents responsive to RFP #11 or any other discovery request." *Id*. p. 9, ¶(b). Chemworld filed a response. In its reply, Apex noted that it was seeking not only documents responsive to Request for Production No. 11 but that Apex was asking for Chemworld to be held in contempt "for failing to comply with this Court's Order to produce all documents responsive to it." Apex reasoned that Chemworld's failure to search for years' worth of emails, as well as potentially other responsive documents on their hard drives or servers, means that Chemworld did not search for documents responsive to Apex's other discovery requests.

On July 25, 2016, Chemworld filed a Motion for Order to Compel an Electronically-Stored Information Protocol related to this same dispute. The motion was fully briefed.

On August 9, 2016, Apex filed a Motion for Leave of Court to File a Second Amended Consolidated Complaint. *See* (ECF 395). In that motion, Apex sought to consolidate all allegations of the underlying complaints into one complaint, to streamline Apex's factual theory of the case, and to narrow the legal theories under which it is proceeding. Apex indicated that it is no longer seeking recovery for computer tampering or trademark infringement and that it is no longer claiming as a trade secret certain categories of information, "such as customer lists." (ECF 395, p. 2).

The Motion for Leave of Court to File Second Amended Consolidated Complaint was unopposed. On September 13, 2016, at 11:33 a.m. (CST), the Court granted the motion. The same day, at 11:58 a.m. (CST), Apex filed the Second Amended Consolidated Complaint ("Second Amended Complaint").

Also on September 13, 2016, at 4:39 p.m. (CST), the Court issued an Order ("ESI Order") on the other two pending motions—"Plaintiff's Motion for Order to Show Cause Why the Chemworld Defendants Should not be Held in Contempt for Failing to Comply with this Court's January 22, 2015 Order and for Sanctions," and the "Motion for Order to Compel an Electronically-Stored Information Protocol." The Court did not consider or review the Second Amended Complaint in making the ruling.

In the September 13, 2016 ESI Order on the two motions, the Court found that Chemworld should not be held in contempt but that Chemworld unfairly withdrew the agreement to a procedure to search for responsive emails and documents on the computers. The Court further found that an agreed ESI protocol is essential at this stage of the discovery process and should have been

4

completed almost two years ago at the outset of the litigation. The Court overruled Chemworld's objection that imaging the hard drives will result in the production of irrelevant, privileged, and sensitive data, noting that imaging the computer means making a copy of it so that the ESI is preserved. The Court further noted that it is the subsequent search protocol to discover the emails responsive to Request for Production No. 11, to be jointly developed by the parties' experts, that will address concerns of relevance and privilege. The Court noted that the Modis and counsel for Chemworld will have an opportunity to review responsive documents from any search before producing them to Apex.

The Court ordered (1) the parties to confer and execute an agreed-upon written ESI protocol on or before September 23, 2016; (2) Chemworld to have the relevant Chemworld computers/hard drives imaged for the purpose of locating pre-2014 emails and any other pre-2014 documents responsive to Plaintiff's request for Production No. 11 on or before October 7, 2016; (3) the parties' experts to work jointly to develop a search protocol; (4) the parties' experts to jointly investigate whether and to what extent pre-2014 emails are available through Go Daddy; and (5) the experts to provide a report of their findings to counsel by October 28, 2016.

As background for the instant motion, the Second Amended Complaint makes the following relevant allegations:

>    10.    Founded in 2001, Apex performed product testing, certified and sold specialty chemical products in the plastics, coatings and ink industries, which primarily included dyes and pigments ("colorants").
>
>    11.    Shyam Zalani ("Zalani") has been the sole shareholder of Apex since its inception.
>
>    12.    At the time Zalani created Apex, he owned a pre-existing business called Indace, Inc.

13. Indace was primarily in the business of sourcing specialty chemical products for use in the plastics, coatings and ink industries, primarily dyes and pigments. Prior to forming Apex, Indace also sold the product it sourced and imported. . . .

15. When Apex was formed, Indace transferred all assets related to U.S. testing and sale of specialty chemical products to Apex. This included the customer lists, customer qualifications, testing methods, testing specifications, and color standards.

16. Zalani hired Paul Bykowski to work at Apex. Prior to joining Apex, Bykowski worked as the lab manager at a company called Polysolve, which sold specialty chemical products in the U.S., primarily dyes in the plastics industry.

18. Bykowski was the President of Apex from its inception until the day he tendered his resignation on September 5, 2012.

25. Zalani directed Bykowski to set up a color testing laboratory. Apex paid all expenses related to the creation of the lab. At Bykowski's request, the lab was set up near his home in Portage, Indiana.

30. All of the assets outlined in paragraph 28 and 29 are necessary to the business of Apex and are not public: the color standards, testing methods, testing specifications, log books, testing records and standard lot numbering system.

33. In 2002, Zalani and two Louisville businessmen, Jim and Eric Boggess, formed a company they called Finos, LLC. Finos was half-owned by Apex and half-owned by Jim and Eric Boggess. These were the sole members of the LLC.

35. Apex transferred to Finos all assets related to the selling function, such as its customer lists. Apex also ensured that Finos could sell products pursuant to the qualifications and customer vendor approvals Apex (or Indace before it) had obtained from various customers. . . .

36. Apex did *not* transfer to Finos any of its assets or intellectual property related to product testing against specifications – such as the product color standards, testing methods, testing specifications, log books, testing records and standard lot numbering system.

39. One of Apex's responsibilities under the Finos LLC Agreement was to supply the colorants. As the owner of Apex, Zalani did this primarily through his original company, Indace, which was (and still is) in the business of sourcing and importing chemicals directly from India and China.

40. Zalani assigned Bykowski the responsibility of purchasing colorants from domestic suppliers to fill orders in those instances in which there was not enough lead time for Indace to import the material from overseas.

41. Upon information and belief, in approximately 2008 or 2009, Bykowski began sourcing dyes from a domestic supplier called Chemworld.

42. Finos, and Apex before it, sold specialty chemical products, which were mostly dyes. In 2009, Bykowski informed Zalani that one of Finos' customers was in the market for a pigment and that Jim Boggess had told him Finos did not want to entertain this opportunity. Zalani agreed that Apex should pursue this business opportunity and, to that end, the customer was shipped a sample of the requested pigment, which was sourced through Chemworld.

43. Zalani heard nothing more about it and assumed the customer had rejected the sample or decided to purchase the pigment elsewhere.

44. However, unknown to Zalani at the time, Bykowski had usurped the business opportunity for himself. He arranged to act as a sales agent for Chemworld such that the customer would purchase the product directly from Chemworld and he would receive a commission. Accordingly, Bykowski diverted the business opportunity from his employer, Apex, to Chemworld, with himself getting a kickback in the form of a commission.

45. Bykowski accomplished this by conspiring with Chemworld, which supplied the pigments. Atul and Manoj Modi, Chemworld's owners, knew Bykowski was an employee of Apex at the time. Nevertheless, they made a deal with him in which he would sell their pigments directly to customers (which Bykowski identified through his position at Apex, and would provide testing services through the Apex laboratory) and Chemworld would pay him a commission.

46. Chemworld paid the commission on these pigment sales to GB Consulting, a company formed and controlled by Bykowski. In the 2010-2012 time period, this side pigment business yielded Chemworld significant revenues and profits and Apex employee Bykowski tens of thousands of dollars in commissions – on top of the salary he was collecting as Apex's president.

47. Bykowski conducted all the testing on these pigment sales using Apex's laboratory in Portage, Indiana. In addition to being deprived of the pigment sales, Apex was never compensated for conducting the lab work. Chemworld knew that the work was being done.

49. Bykowski also assisted Chemworld in becoming the primary supplier of dyes to Finos. As explained earlier, the Finos LLC Agreement provided that Apex would source colorants, which Finos would then sell. . . .

50. In order for Bykowski to assist Chemworld in becoming the primary supplier for Finos, he first had to assist Chemworld in developing a portfolio of products to sell to Finos customers. This could only be done by using Apex's color standards, test methods, test specifications, and laboratory. . . .

53. During 2010-2011, Paul Bykowski conspired with Chemworld and its owners to sell directly to Finos customers – cutting Finos out of the business entirely. This had the effect of harming Apex's business because (1) Apex owned half of Finos and (2) under the Finos LLC agreement all revenues and profits from product sales flowed through Finos.

54. Bykowski used Apex assets to conduct testing and product certifications. He used his access to Finos customers, which he acquired through his position at Apex, to solicit the business away from Finos. Bykowski received kickbacks for his work in diverting the business to Chemworld in the form of commissions.

55. In December 2011, Apex filed a petition to dissolve Finos.

58. In mid-2012, and with Finos in the process of dissolving, Apex began positioning itself to sell directly to former Finos clients. To that end, Bykowski gave Zalani a list of products to source from India and China.

59. Zalani traveled to Asia. On September 5, 2012, while Zalani was overseas, Bykowski resigned from Apex.

60. With Zalani out of the country, Bykowski removed several of Apex's assets from the Apex laboratory, including but not limited to the color standards, the log books identifying the sources and usage details of the color standards over time, the color computer with the electronic testing records, and various testing records in hard copy format. Bykowski also took all the information stored on his laptop and other electronic devices regarding Apex's business.

61. Deprived of its assets, Apex could not compete for Finos customers. Conversely, possession of these assets put Bykowski (with Chemworld's assistance) in perfect position to compete for Finos customers.

62. In September 2012, armed with Apex's assets, Bykowski announced to Finos customers that he was starting a joint venture with Chemworld and his company, G.B. Consulting, to sell products previously sold by Finos.

66. During these last months of 2012, Bykowski and representatives of Chemworld, including Atul Modi, were soliciting Finos customers. One of the key representations made to secure the business was the promise that the lab work would continue to be performed by what Bykowski falsely represented was Bykowski's laboratory.

67. Neither Bykowski nor the company he created, GB Consulting, owned a laboratory in 2012. The laboratory Bykowski and Chemworld were referencing belonged to Apex. It was Apex that was conducting the testing and certifying the products for Finos customers – not GB Consulting.

68. Having removed Apex assets and falsely claiming that the GB laboratory had been conducting the testing and certifying Finos products, Bykowski and Chemworld went fullforce and successfully transferred nearly every Finos customer to Chemworld, adding to the list of Finos customers that Bykowski and Chemworld had already transferred to Chemworld.

70. Bykowski's possession of Apex's assets enabled him to convince Finos customers that they did not have to qualify Chemworld as a new supplier but that, instead, the qualifications obtained by Finos could be transferred to Chemworld.

71. Bykowski's theft of Apex's assets deprived Apex of the opportunity to compete for Finos customers on equal footing: Bykowski absconded with the standards, log books, test records, color computer and all the records he maintained on his laptop and other electronic devices. Apex was left to start from scratch. Apex would have to redevelop and recreate all these assets, and get product qualifications and vendor approvals from each customer.

72. Bykowski's and Chemworld's actions shut Apex out of the industry during the crucial period when several customers were – due to the Finos' dissolution – in the market for a new supplier of colorants. Once customers had accepted Chemworld as their new supplier, unless Apex could severely undercut Chemworld in price there was no reason for all those customers to go through the time and expense of qualifying Apex to sell them virtually the same product. Thus, in effect, Bykowski and Chemworld effectively put Apex out of business.

73. Chemworld worked hand in hand with Bykowski to transition Finos customers to Chemworld.

77. In April 2013, Apex learned of Bykowski's treachery when a customer contacted the company confused about which company (Apex or Chemworld) was supplying their product.

(ECF 397).

The Second Amended Consolidated Complaint alleges the following claims against Chemworld: Civil Conspiracy to Misappropriate Apex's Property (Count I); Civil Conspiracy to Tortiously Interfere with Apex's Prospective Economic Advantage (Count III); Tortious Interference with Prospective Economic Advantage (Count IV); Conspiracy to Misappropriate Apex's Trade Secrets in Violation of the Indiana Trade Secrets Act (Count V); and Misappropriation of Apex's Trade Secrets in Violation of Indiana Trade Secrets Act (Count VI).

## ANALYSIS

In the instant motion, Chemworld asks the Court to reconsider the ESI Order of September 13, 2016, or, in the alternative, to issue a protective order against Apex's Request for Production No. 11, on the basis that the allegations in the Second Amended Complaint no longer support the discovery sought in Request for Production No. 11.

As an initial matter, Apex argues in its response brief that the Motion to Reconsider is not proper because the Second Amended Complaint is not newly discovered evidence. A motion for "[r]econsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.,* 90 F.3d 1264, 1270 (7th Cir.1996). Instead,

> a motion to reconsider is only appropriate where a court has misunderstood a party, where the court has made a decision outside the adversarial issues presented to the court by the parties, where the court has made an error of apprehension (not of reasoning), where a significant change in the law has occurred, or where significant new facts have been discovered.

*Broaddus v. Shields*, 665 F.3d 846, 860 (7th Cir. 2011) (citing *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir.1990)). "Such problems [that are appropriate for

10

reconsideration] rarely arise and the motion to reconsider should be equally rare." *Bank of Waunakee*, 906 F.2d at 1191 (quoting *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va.1983)).

The Court finds that the Second Amended Complaint is a proper basis for the Motion to Reconsider in this instance. First, Apex was not granted leave of Court to file the Second Amended Complaint until September 13, 2016, after the two discovery motions were fully briefed. Second, Apex filed the Second Amended Complaint on the docket on September 13, 2016, the same day leave to do so was granted. By coincidence, the Court issued its Order on the two discovery motions several hours later that same day. Thus, Chemworld did not have an opportunity to seek leave to file supplemental briefing on the motions in light of the Second Amended Complaint. Finally, the Court did not consider the Second Amended Complaint in ruling on the two motions. Apex is correct that Chemworld *knew* about the *proposed* Second Amended Complaint over a month before the Court issued its rulings on September 13, 2016, and did not object to the Second Amended Complaint being filed. Nevertheless, the Second Amended Complaint was not of record until September 13, 2016. Under all the circumstances, the Court finds that, procedurally, the filing of the Second Amended Complaint and arguments about the scope of discovery are a proper basis for the instant motion to reconsider.

However, the Court finds that Chemworld has misconstrued the Second Amended Complaint in the instant motion by artificially narrowing the scope of the pleading through selective citation of the allegations. Chemworld asks the Court to reconsider the September 13, 2016 Order on the basis that the Second Amended Complaint removed the allegations that "customer lists" are no longer a trade secret such that Request for Production No. 11 is no longer relevant. Chemworld also

11

argues that the claims in the Second Amended Complaint "contradict" the claims Apex made in the original complaint. (ECF 401, p. 1-2). The Court disagrees and denies the motion.

Although the Second Amended Complaint no longer alleges that "customer lists" are a trade secret, the vast majority of the allegations, many of which are set out in the Background above, relate to Bykowski and Chemworld's alleged conspiracy to misappropriate business, which includes customers, from Apex and Finos. The misappropriation of the business was based in large part through the use of Apex assets in order to obtain Finos' customers to the benefit of Bykowski and Chemworld instead of Apex. Later, as a result of the misappropriation of Apex's assets, which Bykowski and Chemworld allegedly passed off as their own, Apex alleges that it was shut out of the marketplace when Finos' customers were looking for a new supplier. Thus, communications between Chemworld and others "regarding customers and/or former customers of [Apex] and/or Finos" as sought in Request for Production No. 11 remain relevant *not* because Plaintiff is alleging that Chemworld took Apex or Finos' customer list but because Bykowski and Chemworld's customers were the business that was allegedly being usurped from Plaintiff.

As for the relevant time period, the Court clarifies that the relevant time period for the discovery is 2008 through 2013. Apex, through Bykowski, began working with Chemworld in 2008 and the first alleged misappropriation occurred in 2009 and continued through at least 2012. In footnote 1 to its motion, Chemworld states that there is no reference to "2008" in the Second Amended Consolidated Complaint. (ECF 401, p. 2). This is incorrect. Paragraph 41 of the Second Amended Consolidated Complaint alleges: "Upon information and belief, in approximately 2008 or 2009, Bykowski began sourcing dyes from a domestic supplier called Chemworld." Chemworld is correct that the Second Amended Complaint limits the allegations of misappropriation through

12

the year 2012. *See* (ECF 397, ¶¶ 46, 65, 66, 67, 91(b), (k) - (o)). However, all communication that is relevant to that time period likely did not abruptly end on December 31, 2012. Therefore, the time period through 2013 is relevant.

The Court's reasoning from the January 22, 2015 Order is still applicable. The Court ruled that Request for Production No. 11 "seeks documents that may support Plaintiff's allegation that each person involved was part of a civil conspiracy to misappropriate Plaintiff's 'trade secrets' and business." *Id*. Although the "customer lists" are no longer alleged to be a "trade secret," the Second Amended Complaint continues to allege misappropriation of Apex's business, which implicates both its customer lists and those of Finos. Thus, Request for Production No. 11, requesting communications about "customers and/or former customers of Apex and/or Finos," is not overbroad or irrelevant for the time period 2008 through 2013.

As expressed in the briefing on the underlying discovery motions, Chemworld continues to express concerns about sacrificing proprietary control of its hard drives, based on relevance. However, the Court has reaffirmed the relevance of Request No. 11. At this stage, Chemworld's request for a protective order is premature. The Court has ordered the parties to establish an ESI protocol. Through the negotiation of that protocol, most if not all concerns about discovery of irrelevant personal information contained on the hard drives will be resolved. It is only if the parties reach an impasse on specific issues that a request for a protective order would be appropriate.

Finally, in Part IV of its motion, Chemworld asserts that, in early August 2016, Atul Modi determined that Chemworld's Microsoft Outlook program needed to "rebuild the Index" for the "Search" function in order to return communications older than those previously produced. After the rebuild, Chemworld identified an additional 418 potentially responsive documents. First,

Chemworld did not notify the Court of these emails discovered in early August 2016 prior to the Court's September 13, 2016 ruling on Chemworld's motion. Second, Chemworld has not produced any of these documents to Apex. Third, is unclear to the Court whether the 418 documents include the time period of 2008-2013 and whether they include documents regarding the customers of Apex and/or Finos. The discovery of these 418 documents does not render irrelevant or "draconian," as asserted by Chemworld, the requirement in the Court's September 13, 2016 Order that the Chemworld hard drives be imaged for purposes of conducting the relevant searches. If the 418 documents are relevant, they should be immediately turned over to Apex. The discovery of these documents by Chemworld in August 2016 does not change the Court's September 13, 2016 Order.

In its response brief, Apex asks the Court to clarify that the Court's September 13, 2016 ESI Order on the two discovery motions is not limited to Request for Production No. 11. Apex notes that the ruling in the Court's September 13, 2016 Order appears to limit the ruling to production of documents relevant to Request No. 11 but that Apex's motion asked to search for all relevant documents prior to 2014 because all of the document production following the January 22, 2015 Order was limited to 2014 and 2015. In its original motion, Apex explained that it had requested the imaging of the hard drive for the purpose of locating pre-2014 emails "responsive to RFP 11 *or any other discovery request*." (ECF 386, p. 9) (emphasis added). The only portion of the original motion limited to Request for Production No. 11 was the request for an order to show cause, which the Court denied. Chemworld does not dispute that its production of documents to all discovery requests following the Court's January 22, 2015 Order did not search for emails pre-dating 2014 or other ESI. Thus, the Court hereby **CLARIFIES** that its September 13, 2016 Order extends to a search of the available pre-2014 emails and other ESI, which Chemworld should have searched in the first

14

instance but did not, for documents responsive to any outstanding discovery request. Moreover, Chemworld has an ongoing obligation to supplement discovery under Federal Rule of Civil Procedure 26(e).

## CONCLUSION

Based on the foregoing, the Court hereby **DENIES** the Motion to Reconsider ESI Order of September 13, 2016, or in the Alternative for a Protective Order Against Plaintiff's Request for Production No. 11 [DE 401].

Because the deadlines originally set by the Court have passed, the Court **ORDERS** (1) the parties to confer and execute an agreed-upon written ESI protocol on or before **January 31, 2017**; (2) Chemworld to have the relevant Chemworld computers/hard drives imaged for the purpose of locating pre-2014 emails and any other pre-2014 documents responsive to Plaintiff's request for Production No. 11 on or before **February 13, 2017**; (3) the parties' experts to work jointly to develop a search protocol; (4) the parties' experts to jointly investigate whether and to what extent pre-2014 emails are available through Go Daddy; and (5) the experts to provide a report of their findings to counsel by **January 31, 2017**.

So ORDERED this 17th day of January, 2017.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT
