UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| APEX COLORS, INC. ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO.: 2:14-CV-273-PRC |
| ) | |
| CHEMWORLD INTERNATIONAL LIMITED, ) | |
| INC., CHEMWORLD INTERNATIONAL ) | |
| LIMITED, LLC, ATUL MODI, MANOJ MODI, ) | |
| and PAUL BYKOWSKI, ) | |
|     Defendants. ) | |

## OPINION AND ORDER

This matter is before the Court on (1) Defendants' First Motion to Prohibit Jack A. Ladson from Offering Expert Opinions on Probability or Plausibility [DE 619], filed by all the Defendants on May 13, 2018, (2) Defendants' Second Motion to Prohibit Jack A. Ladson from Offering Certain Expert Opinions Regarding the Standards Used at Finos, LLC [DE 621], filed by all the Defendants on May 13, 2018, and Defendants' Third Motion to Prohibit Jack A. Ladson from Offering Certain Expert Opinions Regarding the Sophistication and Certificates of Analysis Issued by Chemworld [DE 623], filed by all the Defendants on May 14, 2018. Plaintiff Apex Colors, Inc. ("Apex") filed its response briefs on June 15, 2018. Defendants filed their reply briefs on June 23 and 24, 2018.

These motions are governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In addition, Federal Rule of Evidence 403 provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Rule 702 is interpreted by the United States Supreme Court as "a flexible standard that boils down to two over-arching requirements for expert witness testimony," namely that the "expert testimony must be 'ground[ed] in the methods and procedures of science' and must 'assist the trier of fact to understand or determine a fact in issue.'" *Krik*, 870 F.3d at 674 (quoting *Daubert*, 509 U.S. at 590-02). In its role as an evidentiary gatekeeper, a trial judge must make a preliminary assessment that the testimony's underlying reasoning or methodology is scientifically valid and properly applies to the facts at issue. *Id*. (citing *Daubert*, 509 U.S. at 592-93).

In this judicial circuit, to determine the reliability of a qualified expert's testimony under *Daubert*, the trial judge considers, among other things, "(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Id*. (quoting *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 844 (7th Cir. 2017); *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000)). The factors are to be applied "flexibly as the case requires." *Id*. (citing *United States v. Brumley*, 217 F.3d 905, 911 (2000)).

On October 20, 2017, Apex served the 103-page expert report of Jack A. Ladson, of Color Science Consultancy. Defendants have filed three separate motions, each seeking to bar a different opinion of Mr. Ladson. The Court considers each motion in turn.

## A. Defendants' First Motion

In this motion, Defendants seek an order barring the admission of Mr. Ladson's opinions or conclusions (1) regarding the plausibility or probability that two sets of Certificates of Analysis tested against the same standard, years apart, could yield identical test results and (2) parroting Brian West's inadmissible opinion testimony.

In Section III.1.A of his expert report, Mr. Ladson sets forth the topic to be addressed: "The plausibility that two sets of Certificates of Analysis, or COAs, tested against the same standard, but different lots tested against those standards years apart, could yield identical test results." (ECF 620-1, p. 30). In an initial response to the topic, Mr. Ladson opines generally: "The possibility of two COAs, tested against the same standard and different or the same lots separated in time, some years apart, having identical color values is practically non-existent. In statistical language the probability of this occurrence diminishingly approaches zero (0)." *Id*.

Then Mr. Ladson states that he examined "55 COAs issued by Finos or Apex and Chemworld from this case. 16 of the comparisons, consisting of 33 COAs, were exactly the same in time stamp, lot number and measurement fields." *Id*. In his report, Mr. Ladson describes the method he used to compare the COAs, including the assumptions in the question posed, and identifies the "two or three measurements that qualify for a product whose color values are identical." *Id*. at pp. 30-36. Mr. Ladson opines under the heading "Conclusion I":

> In industry when examples of identical pertinent data like this are seen, the data are deemed to be fraudulent and referred to as being created or a common expression is "dry-labbed."
>
> More specifically, the data contained within the COAs issued by Chemworld are copies, or cut and paste, or otherwise taken directly from the original data contained in the COAs issued by FINOS and/or Apex.

3

> Thus, Mr. West is correct when he stated in his deposition at Page 84, Lines 5 to 8, "... you couldn't get the same exact numbers. So, this is – this – one is just a copy of the other."

*Id*. at pp. 36-37. Immediately following Conclusion I, he offers Conclusion II:

> Beyond a scientific doubt, the probability of this occurrence of identical data diminishingly approaches Zero (0). Chemworld created duplicate records.

*Id*. p. 37.

Defendants present four arguments for barring these opinions. The Court considers each in turn.

*1.  Ownership of the Finos Certificates of Analysis*

Defendants first argue that Mr. Ladson's ultimate "probability opinion" regarding duplicate test results is irrelevant to the issues in this litigation because Mr. Ladson is accusing Paul Bykowski of copying *Finos* data, not Apex data, onto the Chemworld Certificates of Analysis. Thus, Defendants reason, even though Mr. Ladson states his opinion in scientific terms, the data from the *Finos* Certificates of Analysis underlying his opinion is not relevant because Finos is a dissolved Delaware limited liability company with no claim to the data and on whose behalf Apex may not litigate. Defendants reason that Mr. Ladson cannot, or will not, state any probability that Chemworld duplicated *Apex* data because Mr. Ladson did not specifically cite an Apex Certificate of Analysis in his opinion or state how many Apex Certificates of Analysis were included in the 16 duplicate sets or in the original 55 Certificates of Analysis.

In response, Apex contends that this argument is based on Defendants' version of the underlying facts and that Defendants are improperly asking the Court to resolve a disputed factual issue, which Apex says is irrelevant to Mr. Ladson's opinions. Apex asserts that it alone owns the testing data and records that resulted in the Finos Certificates of Analysis, which were based on tests

4

run in Apex's lab and on Apex's equipment, as well as the Certificates of Analysis that Apex prepared reflecting the data from the tests it ran.

Notably, Mr. Ladson gives no opinion on whether Apex or Finos own the data; rather his opinion is that the Chemworld Certificates of Analysis were copied from the earlier Certificates of Analysis, whether from Apex or Finos. Even if Mr. Ladson had based his opinion on Apex's version of the facts, he would have been allowed to do so, as an expert is permitted to give an opinion on matters within his admitted competence based on one version of the facts over the other. *See Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006) ("Experts routinely base their opinions on assumptions that are necessarily at odds with their adversary's view of the evidence." (citing *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722 (10th Cir 1993); *Int'l Adhesive Coating Co. v. Bolton Emerson Int'l*, 851 F.2d 540, 546 (1st Cir. 1988))). The Advisory Committee Notes to Federal Rule of Evidence 702 provide:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

Fed. R. Evid. 702, advisory committee note (2000). Unlike in *State Farm Fire & Casualty Co. v. Electrolux Home Products, Inc.*, 980 F. Supp. 2d 1031, 1049 (N.D. Ind. 2012), cited by Defendants, in which the court found that the expert had not independently verified the reliability of the data, rendering the statistical analysis unreliable, in this case, Mr. Ladson's opinion that Chemworld copied the Certificates of Analysis is not based on any finding regarding whether the original Certificates of Analysis belonged to Apex or Finos. Moreover, such finding was not necessary to the opinion.

Defendants are asking the Court to make a factual finding that Apex had no ownership rights in the testing data or the Certificates of Analysis that Apex says it prepared during the period Apex was testing products sold under the Finos label. The Court declines to make any factual finding regarding the ownership of the Finos Certificates of Analysis on the instant motion. Because this opinion of Mr. Ladson's is not dependant on a factual finding regarding ownership of the underlying data and the Certificates of Analysis, the Court declines to bar Mr. Ladson's opinion on this basis. Defendants are free to make this argument to the jury, if appropriate, as the evidence is presented at trial. *See Richman*, 415 F. Supp. 2d at 942 (recognizing that if there is some factual support for the basis of the expert's assumptions, then "it is for the jury, properly instructed, to determine the credibility of the witnesses and thus the weight to be given to the expert opinion"). The Court denies the motion brought on this basis.

2. *Statistics*

In addition to the opinion set forth above from Section III.1.A of his report, Mr. Ladson further provides the following analysis in Section III.1.B, titled "The plausibility of repeated instances of two (2) COA's having the same (identical) values issued at different times." (ECF 620-1, p. 38). In the "Background" and "Quantitative Analysis" sections, Mr. Ladson sets out his statistical analysis of the probability that the Certificates of Analysis would contain the same data. Mr. Ladson then offers Conclusion III:

> Beyond a reasonable scientific doubt, the occurrences as described would never happen.
>
> Mr. West is correct when he stated in his deposition Page 212, line 18 to 21, . . . "the probability of the same numbers could appear in four separate tests of Certificate of Analysis is: 'I'd say non-existent.'"

*Id*. at p. 38.

Defendants argue that Mr. Ladson lacks the training or experience or specialized knowledge to offer opinions in statistics and data analysis because his curriculum vitae does not show that he has a degree in mathematics or statistics. Defendants reason that, although Mr. Ladson "probably" has the experience and education credentials to qualify as an expert in "color science" under Rule 702 based on his engineering degree in Optical Design and his experience since 1975 involving color science, he lacks the education and experience to offer any opinions in "statistical probability." Defendants argue that a court cannot accept expert statistical or data analysis opinion merely because the witness purports to be an expert in *some* field of scientific endeavor.

Mr. Ladson does not have to hold a degree in statistics or mathematics to incorporate a basic probability calculation in his opinion. *See Martin v. Indiana Michigan Power Co.*, 292 F. Supp. 2d 947 (W.D. Mich. 2002) (cited by Defendants). The limited aspect of Mr. Ladson's opinion offering statistical analysis is grounded largely in his understanding of color analysis and his experience in the industry working with Certificates of Analysis. Mr. Ladson holds an engineering degree, has completed course work in mathematics at MIT, and has 40 years of experience in the colorant industry. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, experience, training, or education.'"). Defendants have not offered any argument or law that Mr. Ladson's basic probability calculation is sufficiently sophisticated to require a degree in mathematics or statistics rather than an engineering degree. Mr. Ladson's report sets out the calculations and statistical analysis that he used to arrive at his conclusion. There is a sufficient basis in the report from which Defendants can cross examine Mr. Ladson in order to challenge his statistical analysis.

The Court finds that Mr. Ladson is qualified to give the limited statistical analysis in this opinion, which is founded largely on his knowledge of the industry and how the industry views the type of identical data observed between the Finos and/or Apex Certificates of Analysis and those of Chemworld. The Court denies the motion brought on this basis.

3. *Brian West's Deposition Testimony*

In the third paragraph of Conclusion I, Mr. Ladson confirms Brian West's deposition testimony that "you couldn't get the same exact numbers. So, this is – this – one is just a copy of the other." Defendants argue that Mr. West's opinion suffers from the same fatal error as Mr. Ladson's by not stating whether it was Apex or Finos data that was copied, that Mr. West is giving an opinion on statistics in his testimony, that Mr. West is not offered as an expert, and that Mr. West's opinion is inadmissible; thus, Defendants argue that Mr. Ladson improperly bases his opinion on that of Mr. West.

A reading of the report as a whole demonstrates that Mr. Ladson came to his opinion based on his analysis of the 55 Certificates of Analysis and that Mr. Ladson's opinions are not based on Mr. West's deposition testimony. Rather, Mr. Ladson agrees with Mr. West's testimony that Chemworld falsified Certificates of Analysis. Defendants point to nothing in Mr. Ladson's report showing that he based his opinion on Mr. West's testimony. The Court denies the motion brought on this basis.

4. *Rule 403*

As noted above, Federal Rule of Evidence 403 provides that the "court may exclude evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusion of the issues, [or] misleading the jury . . . ." Fed. R. Evid. 403. Defendants argue that, even if Mr.

8

Ladson's opinion on probability is allowed, the probative value of the opinion is nominal because he is "merely parroting" Mr. West without first establishing ownership of the data as belonging to either Apex or Finos. Defendants reason that the jury will be confused by Mr. Ladson's failure to identify the ownership of the original data. Defendants reason that a layperson can compare the two pieces of paper and determine each to include identical sets of data. And, Defendants argue that they will be prejudiced by the jury hearing that Paul Bykowski copied the Certificates of Analysis given that it is Defendants' position that the original Certificates of Analysis belong to Finos and not Apex.

Exclusion under Rule 403 is not warranted. A layperson with no background in this particular industry has no context for understanding the meaning of the identical sets of data or that this is known in the industry as "dry-labbing" and fraudulent. Mr. Ladson's opinion will assist the trier of fact to understand or determine a fact in issue. As discussed above, Mr. Ladson is not "merely parroting" Mr. West; he comes to an independent opinion based on an analysis of the Certificates of Analysis. It is Apex's position that the facts support a finding that, notwithstanding the name "Finos" at the top of the pages, the Certificates of Analysis were the property of Apex. The parties will have an opportunity to present evidence to the jury regarding ownership of the data and the Certificates of Analysis, with jury instructions if necessary. The Court finds that, under these circumstances, the probative value of Mr. Ladson's opinion is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

For all the reasons above, the Court denies the First Motion to Bar Jack Ladson's Opinion.

## B. Defendants' Second Motion

In Section III.3.A of his report, Mr. Ladson addresses this issue: "The plausibility of using the same color standard from a lot/batch that is ten or more years old and never developing a replacement standard." (ECF 620-1, p. 48). In his "Conclusion," he opines:

> In the opinion of the expert, with 40 years of experience in the plastics and related industries, I am unaware of any chemical companies that retain the same standard for a period of 10 years. According to the US Census Bureau, there are 3,261 companies in the US that manufacture plastic products. Of the 100 companies (out of the entire universe of companies) in which I have personal knowledge and experience none of those companies keep the same standard for ten years.

(ECF 620-1, p. 50).

In the Second Motion, Defendants first argue that Mr. Ladson's opinion that he is "unaware of any chemical companies that retain the same standard for a period of 10 years" lacks any scientific or technical evidence. Defendants note that Mr. Ladson admits in his analysis that "[t]here is not any definitive information on the effect of long term storage conditions on chemical dye standards" and that "[thermal degradation and photodegradation] have never been applied to and evaluated for long term studies." *Id*. at p. 48. Next, Defendants note that Mr. Ladson's opinion is contrary to Eric Boggess' testimony that a single set of standards was used at the Finos laboratory from 2003 until Finos's dissolution in 2013. Defendants note that Finos is not a party to this lawsuit, and, thus, the opinion is not relevant.

Defendants also argue that Apex appears to be using Mr. Ladson's opinion on this issue to disprove Paul Bykowski's contention that the standards he used at Finos in 2012 are the same standards he used at PolySolve in 2001. Defendants reason that Apex wants the jury to discredit Mr. Bykowski's testimony on the origins of the Finos standards and to credit Zalani's claim that Zalani "donated" the standards to Apex. Defendants note the testimony of Eric Boggess that Finos created

a qualifying set of standards as part of the ISO Certification process, referred to as "FinoPlas" standards, confirming that Mr. Bykowski asserted ownership of the standards and requalified them as FinoPlas standards. Thus, Defendants argue that Mr. Ladson's opinion that no one keeps standards for ten years could only create confusion or mislead the jury and should be excluded under Rule 403.

In response, Apex notes that Paul Bykowski testified at the preliminary injunction hearing that all the standards he ever used at Apex/Finos were the standards he brought with him from his prior employment at PolySolve. It is Apex's intention to argue at trial that Mr. Bykowski's testimony is a lie. Apex intends to do so by showing that it is not plausible that a company would maintain the same standard over a period of ten-plus years. Apex contends that, although this may be obvious to a person with experience in the color industry, this is not obvious to a layperson.

Exclusion under Rule 403 is not required. Mr. Ladson's opinion explains why there are no studies regarding ten-year-old standards and explains the industry practice, none of which Defendants acknowledge in their motion. The opinion is based on Mr. Ladson's experience in the industry and not scientific testing. As for the conflict between Mr. Ladson's opinion and the testimony of Paul Bykowski and of Eric Boggess, the jury will be able to weigh the testimony and reach its own conclusion. The jury can consider Mr. Ladson's statement, based on his professional experience, that none of the 100 companies he is familiar with uses the same standards for ten years and compare it with the testimony in this case from Craig Weadon, Shyam Zalani, Paul Bykowski, and Eric Boggess that they used the same standards for periods of time close to or exceeding ten years. It is not the Court's place to judge the credibility of Mr. Ladson's opinion or to use it to weigh the veracity of Mr. Bykowski's testimony. The Court finds that this opinion on the use of standards

in the industry is grounded in Mr. Ladson's experience in the industry, is relevant, and will assist the trier of fact. *See* Fed. R. Civ. P. 702. The Court denies the Second Motion to Bar Jack Ladson's Opinion.

## C. Defendants' Third Motion

In Section 9 of his report, Mr. Ladson sets forth this topic question: "Can you form an opinion on the business sophistication of Chemworld and its ability to understand what assets/representations are needed to convince customers to purchase their product in the plastics, inks and coatings industries?" (ECF 620-1, p. 63). Defendants seek to bar two of the four opinions given under this topic.

First, under heading 9A, Mr. Ladson addresses this question: "Is it believable that a company like Chemworld, or person like Atul Modi, based on your observation of his testimony, would not understand what assets/representations are needed to convince customers to purchase their product in the plastics, inks and coatings industries?" *Id*. In response, Mr. Ladson opines: "No, it is not believable that they do not fully understand the general requirements of selling commodities, such as colorant dyes, to their customers." *Id*.

In support, Mr. Ladson explains that Chemworld "may not understand the specific requirements that a customer has upon initial inquiry, but that is revealed during contract negotiations. An example of this may be particle morphology or specific additives incorporated into the colorant to meet their specific requirements." *Id*. Then, Mr. Ladson states that "Chemworld is a sophisticated manufacturer" and cites Chemworld's website, which states that Chemworld is a "leading manufacturer and distributor of colorant and chemical solutions." *Id*. Mr. Ladson defines a "distributor" and explains a distributor's role in relation to customers. *Id*. Finally, Mr. Ladson

12

states that the fact that Chemworld has the ability and knowledge to do custom, color formulations of custom, colorant dyes indicates that Chemworld is a sophisticated chemical laboratory. *Id*. at p. 64.

Defendants argue that Mr. Ladson's opinion is not reliable because it relies on Chemworld's current website, without any date reference, to form his opinions. Noting that Paul Bykowski, who possesses technical laboratory skills, has been working with Chemworld for over five years and that Chemworld financially supports Mr. Bykowski's laboratory in Indiana, Defendants argue that Chemworld's website in 2017 does not reflect the sophistication of Chemworld from 2009 to 2012, when the events underlying this litigation occurred.

However, as noted by Apex, Mr. Ladson recognizes elsewhere in Section 9 that "Chemworld has been in business for 23 years selling colorant days into the plastics industry. According to their website, Chemworld was founded in 1995." (ECF 620-1, p. 67). Mr. Ladson also considered Atul Modi's Rule 30(b)(6) deposition testimony on behalf of Chemworld. *See* (ECF 620-1, P. 8) ("Section II - Materials and Information Relied Upon"). Mr. Ladson gives this opinion based on all of that information, along with his forty years of experience. Defendants' argument that one basis for the opinion does not address the relevant time period goes not to the admissibility of Mr. Ladson's opinion but rather to the weight it should be given. Defendants will have an opportunity to challenge the bases of Mr. Ladson's opinion on cross-examination, if he is called. The Court denies the motion to bar the opinion in Section III.9.A. Because it was raised for the first time in the reply brief, the Court does not consider Defendants' argument that Mr. Ladson's area of expertise does not qualify him to give this opinion.

Second, Mr. Ladson posits this question under the heading 9B: "Is it believable that they don't understand what end users require in terms of COAs, etc.?" (ECF 620-1, p. 65). In response, Mr. Ladson opined: "No, it is not believable. Chemworld obviously understood the requirements for selling solvent dyes in the plastics market." *Id*. Mr. Ladson states that this opinion is demonstrated by Chemworld's falsification of the Certificates of Analysis because "they knew or were aware that the COAs were required for selling solvent dyes to a customer." *Id*. Mr. Ladson then states that "Chemworld's Certificates of Analysis are very sophisticated" and included a representative sample downloaded from what Mr. Ladson represents is Chemworld's website. *Id*. He describes the sample as "a complete, competent and detailed certificate of analysis." *Id*.

Defendants argue that this opinion is unsupported because the sample Certificate of Analysis included by Mr. Ladson was taken from the website www.chemworld.com, which is operated by a non-party and is unrelated to Defendant Chemworld's website, which is www.chemworldintl.com. (Of note, Mr. Ladson cited the correct website in his opinion in III.9.A. regarding Chemworld's sophistication.) Although Mr. Ladson erred in his inclusion of a Certificate of Analysis from the wrong company, Mr. Ladson did not base his opinion solely on this sample. He states that his opinion is based on the fact that Chemworld falsified the Certificates of Analysis by copying from Apex or Finos. As discussed above, Mr. Ladson did a detailed examination of the Certificates of Analysis produced by Chemworld in discovery in this case. Mr. Ladson's mistaken reliance on the other company's Certificate of Analysis does not invalidate the opinion. Defendants will have an opportunity to question Mr. Ladson about this error on cross examination. The Court denies the Third Motion to Bar Jack Ladson's Opinion.

## CONCLUSION

Accordingly, the Court hereby (1) **DENIES** Defendants' First Motion to Prohibit Jack A. Ladson from Offering Expert Opinions on Probability or Plausibility [DE 619], (2) **DENIES** Defendants' Second Motion to Prohibit Jack A. Ladson from Offering Certain Expert Opinions Regarding the Standards Used at Finos, LLC [DE 621], and **DENIES** Defendants' Third Motion to Prohibit Jack A. Ladson from Offering Certain Expert Opinions Regarding the Sophistication and Certificates of Analysis Issued by Chemworld [DE 623].

So ORDERED this 9th day of July, 2018.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT
